Hon. LUKE P. POLAND, ⎫
Hon. ASA O. ALDIS, ⎬ Assistant Judges.
Hon. JAMES BARRETT, ⎭

---

JAMES A. SHEDD & Co. *v.* The Bank of Brattleboro.

*Chancery. Partnership. Confession of judgment. Officer. Marshalling assets. Attaching creditors. Promissory note. Consideration.*

A court of chancery will not interfere to set aside a judgment or execution merely on the ground of a technical informality, even though such objection is so serious that a court of equity could not relieve the other party from its legal consequences. In cases of such defects equity generally refers both parties to their legal rights and remedies.

The auditors prayed the court to set aside an execution in favor of the defendants against a firm (against whom the orators had a claim and a subsequent

attachment to that of the defendants) on the ground that the defendants' writ was returnable to an incorrectly designated term of court, and because the orators' execution was taken out by them against all the members of the firm, upon a confession of judgment by only one of them; *Held,* that these causes were insufficient to justify any interference with the execution by a court of equity.

One partner alone cannot legally confess judgment against the firm.

*It seems* that in the case of a judgment so rendered upon such a confession, the officer, holding the execution issued thereon, will not, as against subsequent attaching creditors of the same property, be justified in paying over to the creditors in the confession the avails of the property attached by him upon the process on which such confession was rendered.

In marshalling assets in equity, it is indispensable that all the parties in interest should be before the court; or at least that the *assets* should be so before this court that the judgment would operate *in rem.* Such is not the case with money deposited in a bank in this State by a citizen of another State, not a party to the bill.

In a case free from fraud there is no such privity among attaching creditors of the same debtor, when one has the first attachment of two distinct and differently located parcels of property, each being sufficient to secure his debt, and the other has an attachment upon only one of such parcels, as will justify a court of equity to so marshall the assets as to compel the first attaching creditor to collect his debt solely out of the property which the other has not attached.

A note given by one in failing circumstances, made payable on demand, and executed solely for the purpose of being immediately put in suit in order to secure the maker's existing obligations to the payee, which have not yet matured, is valid even against subsequent attaching creditors of the property attached in the suit on such note, and whose claims had matured at the time of its execution.

BILL IN CHANCERY. The bill set forth, in substance, that for some months previous to the 1st of September, 1857, John Robertson, Edwin R. Robertson, and J. ♯. C. Cook, were partners in the manufacture of paper, at Hinsdale, New Hampshire, and Bartonsville, Vermont, under the names of Robertson, Cook & Co., and E. R. Robertson & Co., respectively; that on the 25th of September, 1857, such firms still continuing in existence, the defendants held various notes and bills of exchange, made, drawn, indorsed or accepted by John and Edwin R. Robertson, and by Robertson, Cook & Co., none of which had at that time matured; that the members of these firms determined on that day to close

Shedd & Co. *v.* Bank of Brattlcboro.

up their partnership business, for the purpose of defrauding their creditors, among whom were the orators; that on that day they made known to the defendants their desire to put their personal property beyond the control of their creditors, where they, themselves, could have the control thereof; that in pursuance of this purpose it was then agreed between Robertsons & Cook and the defendants, that the former should execute to the latter two promissory notes of twenty-five hundred dollars each, payable on demand, and that the defendants should simultaneously, by bringing a suit on each of such notes, one in New Hampshire and one in Vermont, attach thereon all the personal property of each firm, in each of those States, and should hold the same under such attachments, subject to the control of those firms; that such notes were executed and delivered to the defendants in pursuance of this design, and were received by them as collateral security for their demands against those firms; that suits were immediately instituted thereon by the defendants against such firms, one returnable to the Windham county court, in this State, at the April Term, 1858, and the other returnable to the court of common pleas, in Cheshire county, New Hampshire, at the March Term, 1858; that the writ in the latter suit was immediately placed in the hands of one Priest, a New Hampshire officer, for service, and was served by him, on the same day, by attaching a large amount of personal property, sufficient to satisfy the defendants' claims; that after this attachment in New Hampshire by the defendants, who were the first attaching creditors in both States, other creditors caused the same property to be attached by the same officer; that the attaching creditors afterwards agreed that Priest might sell the property attached, and hold the money to apply upon their several executions when rendered, according to the priority of their respective liens; that Priest accordingly sold the property for two thousand eighty-nine dollars and eighty-three cents, and deposited the money in the defendants' bank; that the defendants in their New Hampshire suit declared on the general counts, and took judgment therein upon one of the twenty-five hundred dollar notes for fourteen hundred and six dollars and four cents damages and eight dollars costs, and left the note in the files of the court, and that execution was issued upon such

judgment, dated April 2d, 1858, and put into the hands of Priest for collection; that on the 25th of September, 1857, the writ sued out upon the other twenty-five hundred dollar note, and returnable to the Windham county court, in this State, (but which, however, was made returnable on the third Tuesday of April, 1858, when it should have been on the second Tuesday,) was placed in the hands of George Slate, a deputy sheriff, for service, who, on the next day, served it by attaching a large amount of personal property belonging to the debtors, in this State; that the orators subsequently brought a suit in this State against Robertson, Cook & Co., and caused the same personal property to be attached thereon by Slate, and that they recovered a judgment thereon for fourteen hundred and thirty-three dollars and twenty-one cents damages and costs, and took out an execution and placed it in Slate's hands for collection, within thirty days from the time of the rendition of .the judgment; that by the consent of the defendants, the orators and other creditors who had attached the personal property in this State, Slate had sold the same for thirteen hundred and seventy-eight dollars and sixty cents, and retained the money to be applied on such judgments as should be rendered, according to the priority of their respective liens; that the defendants, in pursuance of the fraudulent purpose above mentioned, took a confession of judgment on the suit brought by them in this State, on the 12th of April, 1858, from Edwin R. Robertson, before a justice of the peace, for fourteen hundred and seven dollars and costs; that none of the firm were present at such confession except Edwin R. Robertson, and that the other two members had never confessed judgment in that suit; that for the purpose of gaining possession of the avails of the property sold in Vermont, the defendants induced the justice, taking such confession, to issue an execution thereon against all the members of the firm of Robertson, Cook & Co., and that at the time of such confession no note of the debtors, nor any specification of the claim against them, was presented to or left with the justice; that when these suits were brought, the defendants had no claims against the debtors upon which they could then sue, except the twenty-five hundred dollar notes, given for the purpose already mentioned; that the judgment in New Hampshire merged what-

ever claim of the defendants upon which it was rendered, and, therefore, none existed as a basis for the confession of judgment in Vermont; that the orators had offered to pay the claims of the defendants against Robertson, Cook & Co., and E. R. Robertson & Co., if they would assign the same to the orators, which the defendants had refused to do; that the orators had requested the defendants to take payment of their claims out of the money deposited with them by Priest, and on which they had the first lien, and to refrain from collecting the execution issued upon the confession of judgment in this State, all which the defendants had refused to do. The bill prayed that such execution might be set aside, and that the defendants should be decreed to apply the avails of the property, sold by Priest and deposited with them, in payment of the amount of their claim, and be enjoined from proceeding in any way to collect the execution issued upon the confession of judgment, and that they should account with the orators for whatever collateral security they held for their claim against Robertson, Cook & Co., and for further relief, etc.

The answer of the defendants, and the testimony introduced by them, tended to prove that on the 25th of September, 1857, they held paper on which the firms of Robertson, Cook & Co. and E. R. Robertson & Co. were liable, either as drawers, makers, acceptors or indorsers, to the amount of about eight thousand dollars; that but a small portion of this paper was then due; that these firms became embarrased, and being desirous to protect the defendants, executed, for the purpose of securing that end, the two twenty-five hundred dollar notes described in the bill, with the intention that the same should be put in suit in Vermont and New Hampshire, and the property attached, and that this intention was carried out as stated in the bill; that on the same day these notes were given, the defendants released the makers from liability as indorsers upon a certain amount of the paper held by them; that it was expressly agreed between the defendants and the makers of the twenty-five hundred dollar notes, at the time they were given, that the defendants would take judgment thereon for no greater sum than should prove to be due on the paper held by them when such judgments should be rendered; that when the judgments were taken, as stated in the bill, all the

paper held by the defendants, upon which the names of these firms appeared, had been paid, except certain notes and drafts to the amount for which such judgments were taken, being about fourteen hundred dollars.

With the exception of the particulars above recited, and also except that the answer and the defendants' testimony wholly denied the truth of all that part of the bill alleging any intent, communication of an intent, or practices with the intent, on the part either of Robertson, Cook & Co. or of the defendants, to defraud the creditors of the former, the material allegations of the bill were admitted by the defendants.

The testimony on the part of the defendants also tended to show that Cook had not been long connected with the Robertsons in business, and that a portion of the indebtedness to the defendants accrued before he entered the firm ; but it also appeared that the new firm assumed all the liabilities and took all the assets of the old firm, composed of the Robertsons alone. Under the decision of the court, the details of this portion of the testimony become unimportant.

Testimony was taken by the orators tending to prove the allegations of their bill, and the cause was heard before PIERPOINT, Chancellor, at the June Term, 1859, and the bill was dismissed, from which decree the orators appealed.

*G. W. Harmon* and *Edward J. Phelps*, for the orators.

*D. Kellogg* and *J. D. Bradley*, for the defendants.

REDFIELD, Ch. J. It is obvious that most of the topics discussed at the bar are not even remotely alluded to in the bill. There is nothing here in regard to this having been, in part or whole, the debt of the former firm, composed of John and Edwin R. Robertson, and so the effects of the Robertsons & Cook not liable for it. But from the statement in the bill that Cook had been a partner some months before the 1st of September, 1857, and the fact that the oldest paper held by the defendants was made June 10, 1857, on four months, we infer that it was the debt of the Robertsons & Cook on the 25th of September, 1857, and probably so at the time it was made.

So, too, in regard to applying the effects of the partnership after Cook's admission, if that point were made in the bill, the proof even does not seem to make a case for equitable interference. For where a partnership is only changed by the admission of a new partner, all the effects and liabilities continuing the same as before the change, there is no ground whatever for equitable interference in favor of the creditors of the new firm. The higher equity rather exists in favor of the creditors of the old firm. But this court have before held that equity will not interfere in such cases, but let all the creditors of both firms share alike in the property, to which both classes of creditors have contributed, and to which both may be presumed to have given credit. This seems both reasonable and just, and, as we judge, strictly equitable; *Shedd* v. *Wilson*, 27 Vt. 478.

So, too, if any of the paper held by the defendants was really the debt of the former firm, and Cook not then a partner, which seems more than questionable, as all the effects passed into the new firm, it was highly just and proper that the new firm should also assume, with the effects, the burdens of the former partnership. It is certain that such a transaction cannot be characterized as fraudulent in a court of equity, or made the basis of equitable interference in any form.

The same is true of the objection stated in the bill, that the defendants' writ was made returnable at a different time from that fixed by law. This is not even named in argument, upon the ground, we suppose, that it is, at most, a technical defect in the legal proceedings, which does not affect the substantial equities between the defendants and these orators, and of which none but the debtors themselves could take advantage, at any time or in any form, and which they might therefore waive without any just ground of complaint on the part of their other creditors, and which, by not being asserted in the proper time, becomes definitely and perpetually waived and concluded as to the debtors even, and much more as to others, having no legal or equitable interest in the question.

We think the same course of argument must be regarded as a conclusive answer to the objections founded upon the mode in which the defendants obtained judgment against their debtors.

This is no ground of equitable interference. It is, at most, a formal and technical defect, such as a court of equity will never aid a party in asserting, but will sometimes relieve a party from. More commonly, however, courts of equity leave the parties to the assertion of mere technical rights in courts of law.

The defects in the confession of judgment all depend upon the fact that but one of the debtors came before the justice. This has, no doubt, in practice in this State, been regarded as a fatal defect, so far as those not appearing are concerned. But we are not aware that the question has ever arisen in this court. The terms of the statute are, that the " justice may accept and record a confession of any debt to a creditor, made personally, either with or without antecedent process, as the parties shall agree, and render judgment on such confession." Here is evidently an express requirement that the confession shall be made in person. This form of giving judgment very probably grew out of the English practice of giving a creditor a warrant to confess judgment in the name of the debtor. There the act of the debtor is giving the warrant of attorney. This act is required to be verified, in the English practice, by certain statutory formalities, in order to give it authenticity. And the courts have been very cautious in requiring a strict compliance with all the requisite formalities in giving the creditor a warrant of attorney to confess judgment.

But in our practice, under statutes similar to that in this State, it has generally been held that one joint debtor cannot confess judgment for his creditors. And we are not aware that the case of a copartnership is essentially different in this respect, from other joint debtors. Partners cannot, as such, bind each other by the acknowledgement of a partnership debt even, in the form of a specialty, or a judgment. The implied authority or agency of the parties on behalf of the firm, does not extend to any such act.

The entry of judgment then against the three upon the appearance and confession of one, must be regarded as irregular upon its face, and the execution liable to be set aside by *audita querela* brought by the debtors. The execution being valid upon its face might possibly be a protection to the officer to some extent. But as the rendition of judgment and issuing of execution within

thirty days thereafter, are required to charge the property in execution, it would seem that the officer must show the judgment in order to justify making the application upon the defendant's debt in the first instance. If so, that question very probably might be raised at law in a suit against the officer. And if so, and the judgment is void, the remedy will be ample there. But if the judgment against all the debtors upon the confession of but one debtor, the others acquiescing, for the joint debt of all, is sufficient in law to enable the defendants to hold the funds realized by the sale of the joint property, there is certainly no ground for the interference of a court of equity for that reason. For such a result is highly equitable in itself. And the informality of the judgment being the result of accident or mistake, although not of the character to justify a court of equity in relieving against its consequences, is nevertheless so much of the character of an accident or mistake, that a court of equity, if it could not relieve against it, surely could do nothing to aid the other party in taking advantage of it. The least he could say in regard to this informality is that a court of equity could lend no aid in regard to it. Certainly not in favor of the party claiming the benefit resulting from the mistake of the other party. We must commend the parties to the assertion of their legal rights of a technical character exclusively in a court of law.

In regard to marshalling the assets in both States, and compelling the defendants to exhaust their securities in New Hampshire, one most fatal objection is that it is impossible to proceed upon either the fund or the parties in New Hampshire. Both are beyond the jurisdiction of the court. And in marshalling assets strictly, it is always regarded as indispensable that all the parties in interest should be before the court, so that the decree shall be final and conclusive upon their rights ; or at the very least, that the fund should be so before the court that the judgment might operate *in rem.* But it is evident that in this case neither of these things can be said to exist, as to the property in New Hampshire. For money deposited in a bank in this State by an officer for safe keeping is still virtually in the actual possession of such officer ; it is not in the possession of the bank or

of the courts in Vermont any more than if the officer had loaned it to one of our citizens on mortgage security.

We do not intend to say that in no case could any security, which a creditor might have out of the jurisdiction of the State, be taken in account in determining the right of such creditor to go against other funds which were in the State, and upon which other creditors might have a subsequent lien. It might happen that creditors should have ample security upon which other creditors had no claim, and that the neceessary result of letting such creditors hold funds in this State would be to divert them from the creditors here and virtually to put them into the hands of the debtors in New Hampshire, and thus in effect to deprive creditors here of their security, not for the benefit of other creditors having equal equity, but for the ease and advantage of the debtor himself perhaps.

It seems to be supposed that such will be the effect in the present case, but we are not satisfied of any such result from the proof.

It seems to us the case is like that of different creditors having attached different parcels of property in different towns, or counties, and by different officers, and one of the subsequent attaching creditors asks a court of equity to decree the first attaching creditor, who had the first lien on both parcels, to levy his whole debt upon some parcel which is not attached by him, or not in such a state of priority, as to enable him to make it available, without regard to the fact that such a course will crowd out other attaching creditors, whose equities may be just as good as his own, and who might, with equal propriety, ask a decree against him, similar to the one he asks against them. A court of equity surely could not interfere in any such one-sided manner.

A court of equity would never, I apprehend, interfere in regard to the priorities of different attaching creditors, whether of the same, or different parcels of property of the same debtor, unless upon the suggestion and proof that some of the prior attachments were merely colorable and got up, through the connivance of the debtor, for the purpose of diverting the debtor's

property from his just creditors, and thus putting it under his own control through such simulated attachments.     In such cases courts of equity have sometimes reluctantly interfered to prevent irreparable injustice.  And a court might interfere where one creditor had a prior lien upon property, which other creditors could not reach, and which if not applied in the mode desired, would come into the control of the debtor himself.  But that is not this case.  Here the purpose of the orators, in this portion of the case, is to compel the defendants to go against the New Hampshire property first, the effect of which will be to defeat or delay the creditors in New Hampshire for the benefit of the orators, who have a lien upon property here subsequent to the defendants.  Suppose the courts in New Hampshire should decree the defendants to pursue his lien here and collect his debt here, so as to leave the New Hampshire property for their creditors, which they might do, with far more propriety than for us to send a Vermont creditor into New Hampshire to collect his debt there, for the benefit of our citizens, who are creditors of the same debtor, and which would exclude the New Hampshire creditors from all participation in the personal property in either State, and compel them to depend upon one security, when at law they had more, and when the orator might pursue the balance of property, real and personal, remaining in New Hampshire.

If such a decree were to be asked, then in order to countervail the injustice of the decree here sought, we do not see how it could be resisted with any show of justice.  We could not then, as it seems to us, enforce any such decree as is sought for on this point, without a departure from equitable principles, and equally from international comity, both of which we should be unwilling to do.  If a person, having mortgage security here, also attach personal property, we cannot compel him to relinquish his attachment, and rely solely upon his mortgage security.  There is no such priority among creditors of a living debtor, as to justify the marshalling of the assets, in this mode.  And if we cannot do it when the property is all in this State, no more can we do it when a portion of it is in a neighboring State.  We must, in either case, allow the creditor first in diligence, to pursue all his remedies until his debt is realized, and then commend the other creditors

to such redress as their respective priorities will enable them to assert at law, upon the remainder of the debtors property. And the only ground upon which a court of equity can interfere with the disposition of property, so attached, is that of fraud.

Fraud, then, is the only remaining question in the case. And taking the fraud alleged in the bill, as the only thing properly before the court, there does not seem to us any satisfactory evidence to sustain it. The bill makes no specific allegation of fraud, unless it be the execution of the two twenty-five hundred dollar notes, when only about fourteen hundred dollars proved uitimately to be due, and most, or all of that was not due at the time the notes were executed. But it was settled, in *Fletcher* v. *Edson*, 8 Vt. 294, that a note given to indemnify a surety might well be sued before any debt accrued to the payee upon his suretyship, and judgment recovered for the entire debt before the surety paid it, and that there was nothing fraudulent, or objectionable in such a course. But in the present case judgment was not taken, or claimed, for any more than the actual debt. The case just cited seems to relieve this case from all embarrassment on account of the two twenty-five hundred dollar notes. And this seems to be the substratum of the entire claim of fraud, unless the proof showed that this was done for the purpose of cloaking the property of the debtors, and thus enabling them to enjoy it themselves. And in regard to this the evidence is not satisfactory. There is no evidence that the defendants designed to favor the debtors by this arrangement. The only ground of complaint seems to be that the defendants took their pay out of the Vermont property when they might have done it out of the New Hampshire property, as was once arranged among most of the parties. But this arrangement failed by the non-concurrence of the debtors and some of the New Hampshire creditors and their attorneys. There is no claim in the bill for a specific performance of this contract, under which Priest, the New Hampshire officer, sold the property there. It is only stated in the bill, in giving a historical detail of the transactions. No idea of basing relief upon this contract seems prominent, or indeed observable in the bill itself. And it does not appear to us that this contract was ever intended to change or to constitute the basis of the legal rights

and relations of the parties. It seems never until now to have been regarded as anything more than a waiver of all exception to the officer's proceeding at once, and without the formality of pursuing the legal steps, to convert the personal property into money. After that the money came in the place of the property, and the rights of the parties remained unchanged in other respects. The money being in the defendants' vaults, to the credit of Priest, did not change the rights of any one. In contemplation of law, it was still in Priest's hands in the form of the original property attached. The change of form was merely to save the expense of keeping, and the hazard of loss or deterioration. No one's rights were changed or affected by the substitution of money for the property.

We are not able, therefore, to perceive any ground for equitable interference in the case. The claim of a technical merger will not apply, there being two collateral notes, and if it did it is merely technical and not a ground of equitable interference, unless the defendants attempt to enforce one of their collateral remedies after having collected their whole debt upon the other; *Paddock* v. *Palmer*, 19 Vt. 581.

Decree of chancellor affirmed.