**In re VERMONT TOY WORKS, INC., Debtor.**

**CHITTENDEN TRUST COMPANY, Plaintiff–Appellant,**

v.

**SEBERT LUMBER CO., Defendant–Appellee,**

and

**Joseph C. Palmisano, Esq., Trustee and Intervening Defendant–Appellee.**

**Civ. A. No. 88–44.**

United States District Court, D. Vermont.

Dec. 17, 1991.

analogies between the cases. BANKR.RULES 2002; 3002; 3003.

James B. Anderson, Ryan, Smith & Carbine, Ltd., Rutland, Vt., for plaintiff-appellant.

Timothy Martin, Carroll, George & Pratt, Rutland, Vt., for defendant-appellee.

Spencer R. Knapp, Dinse, Erdmann & Clapp, Burlington, Vt., for the Vermont Bankers' Ass'n., as amicus curiae, urging reversal.

## OPINION

GAGLIARDI, Senior District Judge.

Chittenden Trust Company ("Chittenden") appeals the decision of the Honorable Francis Conrad, Bankruptcy Judge, dated December 23, 1987, concerning bankruptcy debtor Vermont Toy Works, Inc. ("Debtor"). *See In re Vermont Toy Works, Inc.,* 82 B.R. 258 (Bankr.D.Vt.1987). In that decision the court applied the doctrine of marshaling of assets. Under the marshaling order, Chittenden was directed to satisfy its notes with Debtor from the personal guarantees and personal assets of Debtor's shareholder and corporate officers and not from its secured interest in Debtor's machinery, equipment, accounts receivable and inventory (hereinafter "collateral"). By requiring Chittenden to look to personal guarantees and personal assets, the court preserved the collateral for the benefit of Debtor's unsecured creditors in the chapter 7 liquidation. The opinion of the bankruptcy court set forth in detail the facts of the case; familiarity with that opinion is assumed, and only an abbreviated version of the facts relevant to this appeal is stated below. For the reasons stated below, the ruling of the bankruptcy court is reversed.

### Background

Debtor is a Vermont corporation engaged in the manufacturing of finished wood products. Debtor's sole shareholder is David Winer, and its directors and officers consist of him, his wife Janet and his son Gordon.

In November 1984, Chittenden extended loans totaling approximately $150,000 to

Debtor. The loans were secured by a perfected security interest in Debtor's collateral and by the personal guarantees of David and Gordon Winer. In addition, David and Janet Winer executed a "Hypothecation Agreement," which authorized Debtor to pledge as additional collateral $125,000 worth of securities owned by David and Janet Winer. In April 1985, Chittenden subordinated $50,000 of its machinery and equipment security interest to the Vermont Industrial Development Authority ("VIDA"), which had loaned Debtor $49,300 on a secured basis.

Chittenden also extended personal loans totaling approximately $493,500 to David Winer and to David and Janet Winer jointly. The proceeds of these loans were invested in Debtor to provide working capital. These loans were secured by real property mortgages and a pledge of the same securities used to secure Debtor's loans. By mid-November 1985, Debtor had defaulted on its loan obligations to Chittenden. On December 6, 1985, Chittenden and VIDA repossessed Debtor's collateral. Under the repossession agreement, Debtor waived its right to redeem the collateral. On December 9, 1985, Chittenden and Vermont Wood Industries, Inc. ("Vermont Wood") entered into an agreement in which Chittenden leased Debtor's repossessed machinery and equipment to Vermont Wood.[1] The lease agreement also contained an option for Vermont Wood to purchase the machinery and equipment for an amount equal to the outstanding declining principal balance on Debtor's loans.

On December 31, 1985, Sebert Lumber Co., Inc. ("Sebert"), along with other unsecured creditors of Debtor, brought an involuntary chapter 7 bankruptcy proceeding against Debtor in an effort to prevent the sale of the machinery and equipment to Vermont Wood. Sebert simultaneously moved the bankruptcy court for an order prohibiting Debtor from selling the machinery and equipment. The bankruptcy court denied Sebert's motion citing 11 U.S.C. § 303(f), which permits a bankruptcy debtor to continue the operations of its business after the filing of an involuntary petition. The court also referred to the possibility that Sebert could obtain relief at some later time under 11 U.S.C. § 362(a)(6) and 11 U.S.C. § 547.[2] Chittenden perceived the court's references to these sections as "placing a cloud" on its title to the repossessed machinery and equipment. On January 17, 1986, Chittenden filed a motion entitled Complaint For Declaratory Judgment Or Motion For Relief From Automatic Stay.

In an order dated March 7, 1986, the court authorized the sale of the machinery and equipment by Chittenden, as agent for the trustee, to Vermont Wood pursuant to the pre-petition contract. The court also ordered that Chittenden's security interest attach to the proceeds and that the proceeds be held in an interest-bearing account pending the outcome of the trial.

At trial, Sebert raised, as an affirmative defense, the doctrine of marshaling of assets.[3] The doctrine of marshaling

1. Vermont Wood was incorporated on October 30, 1985. David Winer is Vermont Wood's president, chairman of the board, treasurer and a fifty percent shareholder. David Winer is one of Vermont Wood's three directors. Vermont Wood's other fifty percent shareholder, Arthur Jacobson, provided the financial investment necessary to fund the corporation. In consideration of his investment, Jacobson was made a fifty percent shareholder and was given the right to name two of Vermont Wood's three directors.

2. Section 362(a)(6) provides for an automatic stay upon the filing of a bankruptcy case of "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6).

Section 547 enables the trustee to demand turnover of property of the estate that is in the possession of another due to a preferential transfer. See 11 U.S.C. § 547.

3. The action was prosecuted by Sebert's attorney on behalf of the trustee. Chittenden argues that Bankruptcy Rule 7017 requires that every action be prosecuted in the name of the real party in interest. The bankruptcy court held that absent any specific limitation in the bankruptcy code, Sebert's attorney could present the marshaling defense on behalf of the trustee with the trustee's consent and the court's approval. For the purposes of this opinion, it will be assumed that the trustee may hire the unsecured creditor's attorney as special counsel to prosecute the lawsuit. See *Carlton v. Baww*

of assets is an equitable principle designed to benefit junior secured creditors. It is traditionally applied when two or more secured creditors claim against one debtor and a senior creditor can reach two properties or funds held by the debtor, whereas, a junior creditor can reach only one. Marshaling requires that the senior creditor first satisfy its claims from the property or fund in which the junior creditor has no interest. Generally, three elements must be satisfied before the doctrine may be applied: (1) the existence of two secured creditors with a common debtor, (2) the existence of two funds belonging to the debtor, and (3) the right of the senior creditor to satisfy its demand from more than one fund, while the other creditor may resort to only one fund. *See Warren v. Warren,* 30 Vt. 530, 535 (1858). The proponent of marshaling must establish these elements by clear and convincing evidence. *See In re United Retail Corp.,* 33 B.R. 150, 154 (Bankr.D.Haw.1983). In addition, the doctrine will not be invoked where it will cause prejudice to the senior creditor or to other parties. *See Meyer v. United States,* 375 U.S. 233, 237–39, 84 S.Ct. 318, 321–22, 11 L.Ed.2d 293 (1963). The marshaling doctrine is designed to prevent the senior lienor from arbitrarily depriving the junior lienor of his security.

The bankruptcy court ordered Debtor's previously repossessed collateral marshaled. Chittenden was directed to seek relief from the automatic stay to satisfy its loans with Debtor from the personal guarantees of David and Gordon Winer. To the extent the loans were not satisfied from the guarantees, Chittenden could seek relief from the automatic stay to liquidate against the pledged securities.

In order to satisfy the "common debtor" and "two fund" elements of marshaling, the court merged the assets of David Winer and Debtor by piercing the corporate

veil. The court concluded that there was sufficient inequitable conduct by David Winer to justify disregarding Debtor's corporate entity. Thus, the court determined that Debtor possessed three funds from which Chittenden could satisfy its loans: the repossessed collateral, the personal guarantees and the pledged securities. The court also concluded that marshaling would not result in prejudice to Chittenden because David Winer had more than sufficient assets to satisfy both his personal loans and corporate debts with Chittenden. Finally, the court subordinated David Winer's guarantee relationship in order to prevent him from becoming subrogated to Chittenden's secured status after Chittenden satisfied its debts from David Winer's personal guarantee or hypothecated securities.

### Discussion

Chittenden filed a timely appeal to this court pursuant to 28 U.S.C. § 158(a). An *amicus curiae* brief urging reversal has been filed on behalf of the Vermont Banker's Association. While Chittenden and the Vermont Bankers' Association have outlined numerous issues, this court finds that there are four issues requiring resolution.[4]

I. Is the trustee entitled to bring a marshaling of assets action?

II. Can the marshaling doctrine be applied without David, Janet and Gordon Winer being parties to this action?

III. Do the facts presented support a decision to pierce the corporate veil and impose personal liability?

IV. Can the marshaling doctrine be applied in this instance without causing prejudice to the senior lienholder or third parties?

This court reviews the bankruptcy court's findings of fact under a clearly erroneous standard and its conclusions of

---

*Inc.,* 751 F.2d 781, 784 (5th Cir.1985); *Barnett v. Stern,* 93 B.R. 962, 972–973 (N.D.Ill.1988), *rev'd on other grounds,* 909 F.2d 973 (7th Cir.1990).

**4.** This court assumes for the purposes of this opinion that Debtor retained an interest in the collateral as of the commencement of the bank-

ruptcy case, which became property of the estate pursuant to 11 U.S.C. § 541(a)(1). Moreover, it will be assumed that this interest was sufficient to grant the estate the authority to invoke the marshaling doctrine with respect to the collateral.

law *de novo*. *In re Levine*, 32 B.R. 742, 743 (S.D.N.Y.1983), *aff'd mem.*, 732 F.2d 141 (2d Cir.1984).

## I. *Trustee's Authority to Invoke the Marshaling Doctrine*

 Only secured creditors have the authority to invoke the doctrine of marshaling. *See Warren v. Warren*, 30 Vt. 530, 535 (1858). The bankruptcy court concluded that (1) the trustee had the status of a hypothetical lien creditor under 11 U.S.C. § 544 (strong-arm power) and (2) that such a creditor is considered a "secured creditor" under Vermont law.

Chittenden argues that the court's holding "confuses the status of the trustee with the status of those he represents: the traditional requirement is not that marshaling be invoked *by* a secured creditor, but that it be invoked *for* a secured creditor." Note, *Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine*, 6 Cardozo L.Rev. 671, 675–76 (1985) (emphasis added); *see also In re Childers*, 44 B.R. 23 (Bankr.N.D.Ala.1984); *In re McElwaney*, 40 B.R. 66, 70 (Bankr.M.D.Ga.1984); *In re The Computer Room, Inc.*, 24 B.R. 732 (Bankr.N.D.Ala.1982). *But see In re Center Wholesale, Inc.*, 788 F.2d 541 (9th Cir.1986); *In re Jack Green's Fashions for Men—Big and Tall, Inc.*, 597 F.2d 130 (8th Cir.1979); *First Nat'l Mercantile Bank & Trust Co. v. Hazen*, 96 B.R. 924 (Bankr. W.D.Mo.1988); *In re Laeupple*, 87 B.R. 74 (Bankr.W.D.Mo.1988); *In re C & B Oil Co.*, 72 B.R. 228 (Bankr.N.D.Ohio 1987); *In re Tampa Chain Co.*, 53 B.R. 772 (Bankr. S.D.N.Y.1985).

 The bankruptcy court, recognizing a split in authority, followed the reasoning of the court in *Tampa Chain*. *See Vermont Toy*, 82 B.R. at 295. *Tampa Chain* held that section 544(a)(2) was the exception to the Code's policy of leaving creditors in the status they enjoyed under state law. *See Tampa Chain*, 53 B.R. at 777. This court agrees with those courts concluding that section 544 grants the trustee the rights afforded a lien creditor under the applicable state law. Under Vermont law, the trustee is considered a secured party. Vt.

Stat.Ann. tit. 9A, § 9–301(3) (1966). Under state law, a secured creditor has the authority to bring a marshaling action. *See Warren v. Warren*, 30 Vt. 530, 535 (1858).

Chittenden claims that the purpose of section 9–301(3) is to determine the order of creditors who take priority over *unperfected* contractual security interests. Under the U.C.C., a trustee in bankruptcy, acting pursuant to section 544(a), takes priority over an unperfected contractual security interest. Chittenden, however, has a fully perfected security interest in the repossessed collateral. Thus, Chittenden argues that section 9–301(3) has no application to the present situation because there is no priority dispute between an unperfected security interest and a judicial lien. This court relies on section 9–301(3) not to determine the priority between the parties, but simply to show that a judicial lien creditor is considered a secured party under Vermont law. Accordingly, this court finds that the trustee has the authority to invoke the marshaling of assets doctrine.

## II. *Absent Guarantors of Corporate Indebtedness*

 David, Janet and Gordon Winer are not parties to this action. Under the court's decision, Chittenden was directed to satisfy its loans with Debtor from David and Gordon Winer's personal guarantees and David and Janet Winer's securities.

 In a marshaling action, entities holding the funds to which only the senior creditor can look must be joined as parties. *See In re Mesa Intercontinental, Inc.*, 79 B.R. 669, 673 (Bankr.S.D.Tex.1987); *In re Coors of N. Miss., Inc.*, 66 B.R. 845, 869 (Bankr.N.D.Miss.1986); *see also In re Luby*, 89 B.R. 120, 124–25 (Bankr.D.Or. 1988). In addition, the Vermont substantive law of marshaling would require that either the parties in interest be before the court or "at the very least, that the fund should be before the court so that the judgment might operate *in rem*." *Shedd & Co. v. Bank of Brattleboro*, 32 Vt. 709, 717 (1860). The trustee's marshaling action must fail because the Winers are not parties to this action and their personal

assets are not subject to the bankruptcy court's jurisdiction.

■ The appellee argues that absent parties should have intervened in this proceeding. The Winers did not intervene, and the proper method of protecting their interests, and more importantly, the interests of their other creditors, is to bring an adversary proceeding against the Winers so that the issues can be framed properly in the pleadings and discovery and other creditors of the Winers can intervene to protect their interests. This is an adversary proceeding between Chittenden and Sebert requesting declaratory relief. Sebert's pleadings do not mention the marshaling doctrine or piercing the corporate veil. This extraordinary application of the marshaling doctrine was not foreseeable to the Winers or their creditors.

■ The bankruptcy court also lacked the authority to bring an equitable subordination action against David Winer. The court subordinated David Winer's guarantee relationship in order to prevent him from stepping into the shoes of Chittenden's secured status after Chittenden satisfied its debts from David Winer's personal assets. Bankruptcy courts exercise a broad range of equitable power in deciding whether to subordinate claims. *See Pepper v. Litton,* 308 U.S. 295, 303–311, 60 S.Ct. 238, 243–47, 84 L.Ed. 281 (1939). However, those powers can only be exercised within the confines of the bankruptcy code. *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988). A claim of equitable subordination based on 11 U.S.C. § 510(c) must be brought in an adversary proceeding. *See* 9 Collier, *supra,* "para." 7001.11, at 7001–25; *see also Matter of Executive Office Centers, Inc.,* 96 B.R. 642, 647–48 (Bankr.E.D.La.1988); *In re Blondheim Real Estate, Inc.,* 91 B.R. 639, 639 n. 1 (Bankr.D.N.H.1988); *In re Bever-*

*ages Intern. Ltd.,* 50 B.R. 273, 278 (Bankr. D.Mass.1985), *aff'd, Creditors Comm. v. Massachusetts,* 105 B.R. 145 (D.Mass.1989).

■ Finally, an adversary proceeding should be brought against David Winer in order to pierce the corporate veil. In order to satisfy the elements of the marshaling doctrine, the court merged the assets of David Winer and Debtor by disregarding the corporate entity and piercing the corporate veil. Piercing the corporate veil is a rarely applied exception to the common debtor element of marshaling. *See Vermont Toy,* 82 B.R. at 320 (listing cases that recognize exception but fail to apply it because evidence insufficient to warrant veil piercing). This court has doubts about the need for such an extraordinary application of the marshaling doctrine to the straightforward facts of this case, but will assume for the purposes of this opinion that the exception is permitted. Nevertheless, this veil piercing action must be brought against David Winer by way of an adversary proceeding. *See In re The Julien Co.,* 120 B.R. 930 (Bankr.W.D.Tenn. 1990); *In re Alpha & Omega Realty, Inc.,* 36 B.R. 416, 417 (Bankr.D.Idaho 1984). *But see In re Crabtree,* 39 B.R. 718, 723 (Bankr.E.D.Tenn.1984); *In re 1438 Meridian Place, N.W., Inc.,* 15 B.R. 89, 94–95 (Bankr.D.D.C.1981).

In *Julien Company,* which was decided after *Vermont Toy,* the court distinguished this case because here the nondebtor's estate was not substantively consolidated with the debtor's estate, but the court pierced the corporate veil to satisfy the elements of the marshaling doctrine. *See Julien Company,* 120 B.R. at 932. Admittedly, this veil piercing action does not substantively consolidate David Winer's estate with Debtor's estate but requires him to satisfy his personal guarantee of Debtor's loans.[5] However, in the context of this

---

**5.** The irony is that if David Winer were a proper party to this action, and the trustee were able to prove sufficient inequitable conduct to pierce the corporate veil, there would be no need to apply the marshaling doctrine to achieve the trustee's objective. *See In re Dealer Support Servs. Int'l, Inc.,* 73 B.R. 763, 765 n. 3 (Bankr.

E.D.Mich.1987); *see also In re Luby,* 89 B.R. 120, 127–28 (Bankr.D.Or.1988) (once corporate veil is pierced the third element of marshaling—that only senior creditor has a right to both funds—is no longer met because junior creditor would have access to both funds). Once the veil was pierced and David Winer's assets were merged

marshaling action, piercing the corporate veil will cost David Winer approximately $150,000 without the benefit of the procedural protections afforded by an adversary proceeding. Even if the marshaling doctrine could be invoked without the Winers being parties to this action, this court reverses the decision of the bankruptcy court for the reasons set forth below.

### III. *Piercing the Corporate Veil*

■ This court cannot subscribe to the bankruptcy court's decision to disregard the corporate entity. I acknowledge that a decision to pierce the corporate veil should not be set aside unless clearly erroneous. *See In re Beck Indus.*, 479 F.2d 410, 417 (2d Cir.), *cert. denied*, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973). However, having reviewed the entire record, this court concludes that the bankruptcy court erred in its decision to disregard the corporate entity.[6]

Application of this obviously amorphous doctrine to the infinite variety of situations which might warrant a court to pierce the corporate veil can be difficult, particularly in the case of close family corporations. *See William Wrigley, Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir.1989). Moreover, Vermont law is hardly clear because there are very few reported decisions on the subject. It is clear, however, that Vermont courts exercise this power reluctantly, and only when necessary to prevent fraud or injustice. *See Jack C. Keir, Inc. v. Robinson & Keir Partnership*, 151 Vt. 358, 560 A.2d 957 (1989).

Courts generally list as reasons for piercing the corporate veil the following: using the corporation to perpetrate a fraud; the personal use of corporate funds; the failure to observe corporate formalities; and undercapitalization. *See Oriental Commercial & Shipping v. Rosseel, N.V.*, 702 F.Supp. 1005, 1019 (S.D.N.Y.1988). Although the bankruptcy court cited the relevant factors, the evidence is insufficient to support this remedy.[7] The record is devoid of any evidence of fraud or the personal use of corporate funds. For the most part, Debtor observed corporate formalities. Debtor's finances were kept separate and apart from David Winer's finances.

■ The bankruptcy court refers to Debtor's failure to hold director's meetings and to approve by a "disinterested quorum" of directors certain actions with David Winer. However, certain corporate formalities are nonsensical when applied to small privately-held corporations and should be given little, if any, weight in a veil piercing action. *See William Wrigley*, 890 F.2d at 601. David Winer is the sole shareholder of the corporation. Under Vermont law, David Winer could have properly acted as the sole director of the corporation. *See* Vt.Stat.Ann. tit. 11, § 1882 (1984). There is simply no reason to require David Winer to remove himself from a meeting so that his wife and son may consider a decision in his absence.

---

with the assets of the corporate debtor, unsecured creditors would have access to his personal assets.

**6.** The bankruptcy court's findings regarding inequitable conduct are also central to the court's determination that David Winer's personal shareholder loans are to be considered contributions to Debtor's capital. *See Vermont Toy*, 82 B.R. at 330.

**7.** The bankruptcy court relied on a "non-exhaustive" list of factors used by courts in determining whether to disregard the corporate entity. *See Vermont Toy*, 82 B.R. at 307. The court also stated:

"The facts of this case present a mix of factors which Courts have regarded as justifying the disregard of the corporate entity in furtherance of fundamental fairness. We do not pretend to exhaust all of the factors in our discussion, rather we provide examples from our findings of fact of David Winer's inequitable conduct which entitles the trustee to marshal and subordinate David Winer's subrogated guarantor relationship."

*Vermont Toy*, 82 B.R. at 325 n. 40. This can be read in one of two ways. Either the court in piercing the corporate veil relied on other factors not stated in the opinion or the court relied only on those listed despite the presence of additional considerations. Having reviewed the record, I conclude that there are no compelling factors absent from the court's opinion and that the factors listed are insufficient to pierce the corporate veil.

 The court also relies on the concept of inadequate capitalization as a factor supporting its decision to disregard the corporate entity. There is no reason to conclude that Debtor was undercapitalized simply because it failed. Vermont has no statutory requirement that a minimum amount of equity capital be invested as a precondition of doing business in the corporate form. The adequacy of capital is measured as of the time of formation of the corporation. *See* 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 44.1 (perm. ed. rev. vol. 1990). Debtor was capitalized with $10,000 in equity in 1979. It cannot be said, based on the nature of the business and the size of the corporate undertaking, that $10,000 was inadequate capital.

 Even assuming Debtor was undercapitalized, this is not a persuasive reason for disregarding the corporate entity in this case which involves contract creditors. Undercapitalization alone is not a sufficient ground for disregarding the corporate entity. *See Gartner v. Snyder*, 607 F.2d 582, 588 (2d Cir.1979). Moreover, the obvious policy behind requiring that the corporate organizers provide a "reasonable" amount of net worth is to prevent the implicit misrepresentation that the corporation has funds for creditors. In other words, had the creditors known that the corporation was thinly capitalized, they could have protected themselves. But, businesses that choose to deal with corporations on a credit basis should protect themselves by doing their own investigation of the corporation's financial condition. *See Bostwick–Braun Co. v. Szews*, 645 F.Supp. 221, 226–227 (W.D.Wis.1986). If those businesses are unsatisfied with the corporation's financial resources, they can choose to protect themselves in any number of ways, one of which is refusing to deal with that corporation.

There was no affirmative or implied misrepresentation by David Winer of the corporation's net worth. Sebert was aware that Debtor was a family corporation funded by David Winer. Moreover, Sebert was aware of Debtor's financial condition and had previously had problems collecting its accounts receivable with Debtor. Sebert could have bargained for any number of protections with Debtor, including shareholder guarantees. Instead, Sebert assumed the risk by dealing with the corporation on a credit basis. Thus, Sebert should be left to the traditional protections afforded unsecured creditors in bankruptcy.

The bankruptcy court also lists four other factors to support its decision to pierce the corporate veil. These factors are not persuasive reasons for disregarding the corporate entity.

 First, the bankruptcy court relied on an alleged preferential transfer by Debtor to David Winer in violation of 11 U.S.C. § 547(b). Within a year of bankruptcy, David Winer received between $15,000 and $20,000 in repayment of his personal loans to Debtor. However, no adversary proceeding was brought against David Winer to enable him to defend this claim. If these payments do constitute a preferential transfer, the appropriate remedy is specifically provided in the bankruptcy code. *See* 11 U.S.C. § 547(b). The trustee may bring an action to avoid all preferential transfers and return those assets to the bankruptcy estate.[8] The assets would then be distributed to the creditors in accordance with section 726 of the bankruptcy code.[9] David Winer was, by far, Debtor's largest unsecured creditor. Unless a subordination action was brought against David Winer, he would receive payment on his unsecured claim. In any event, the maximum amount of injury to unsecured creditors as a result of this alleged preferential transfer is $20,000. Piercing the corporate veil would produce a punitive remedy by exposing approximately $150,000 of David Winer's personal assets.

---

**8.** Other unsecured creditors received payment during the same period. Sebert received over $32,000 during the ninety days preceding bankruptcy against accounts receivable of approximately $74,000.

**9.** Section 726 of the Code dictates the order of distribution of all property of the estate. 11 U.S.C. § 726.

■ Second, the court relied on Debtor's July 31, 1985, execution of a "Settlement Agreement" with David Winer. The settlement agreement provided David Winer with a demand note in the amount of $48,000 for unpaid rent.

On November 15, 1984, Debtor and David Winer executed a lease agreement whereby Debtor agreed to pay David Winer $3,000 a month for the use of David Winer's property. Debtor never made any payments to David Winer. David Winer intended the settlement agreement to provide him with a mechanism for making the leased premises available if Debtor failed. *See Vermont Toy,* 82 B.R. at 272 (finding of fact 31). In addition, the settlement agreement provided David Winer with a demand note in the amount of $132,580.00 for consolidated personal loans to Debtor. This agreement also granted David Winer a security interest in the assets of Debtor. The court viewed the settlement agreement as evidence of David Winer's breach of his fiduciary duty to Debtor.

Even if this court agrees with this conclusion, it does not warrant piercing the corporate veil. This conduct falls far short of demonstrating fraud. More importantly, piercing the corporate veil is not necessary to prevent any injustice that may be caused by the settlement agreement.[10] There is a specific remedy provided by the bankruptcy code to cure any injustice. The trustee may bring an equitable subordination action to subordinate David Winer's claim to that of any unsecured creditor. *See* 11 U.S.C. § 510(c).

■ Third, the bankruptcy court relied on Debtor's sale of a corporate asset to David Winer. In April 1986, Debtor sold a wood toy patent to David Winer for $25,000. While transactions between a corporation and its sole shareholder are to be scrutinized carefully, the record is devoid of any evidence of impropriety. The patent has never been independently appraised. The only evidence as to the value of the patent was David Winer's testimony that Gordon Winer, the inventor of the patent,

valued it at $10,000. This transaction can just as easily be looked at as an attempt to input $25,000 of badly needed capital into Debtor.

The patent should have been valued by an independent appraiser prior to sale. However, the failure to do so does not warrant piercing the corporate veil. Again, the court has a precise remedy to cure any monetary injury if the patent was improperly sold for less than the market value. *See* 11 U.S.C. § 548.

■ Fourth, the court relied on the fact that Chittenden foreclosed on its security interest in Debtor's collateral. The court found this to be an attempt by David Winer to improperly release his assets which guaranteed Debtor's loans. But, once Debtor defaulted on its loans, Chittenden was going to proceed against its security interest in the liquid collateral first, and in the event of a deficiency, against the personal guarantees or pledged securities. There is no reason for Chittenden to sue on a personal guarantee in order to preserve the collateral for the benefit of unsecured creditors, the largest of which is David Winer himself. The pledged securities were also used as collateral for some of David Winer's personal loans. Nor can this court conclude that in order to prevent veil piercing, David Winer must request that Chittenden first proceed not against Debtor's assets, but, against his personal assets. There was nothing improper about Chittenden foreclosing on the security interests in the readily available collateral.

■ The bankruptcy court relies more heavily on its finding that Chittenden and David Winer conspired to create the demise of Debtor. The court found that David Winer "steered a valuable corporate opportunity" to Vermont Wood, and then prevented the debtor from making any further loan payments to create a default. Having reviewed the record, this court cannot agree.

Debtor had insufficient cash flow to service its debts as of the late summer of

---

**10.** As a practical matter, a security interest in Debtor's assets is of little benefit to David Winer, because those assets were already encumbered by Chittenden's security interest.

1985. By the fall of 1985, it was clear that Debtor would not be able to continue in operation without the help of outside investors. In October 1985, Debtor received an order from Tech Furnishings, Inc. Debtor did not have the working capital to purchase the raw materials necessary to fill that order. Debtor was unsuccessful in finding investors, and the deal fell through. Finally, in November 1985, Debtor's two major customers, representing approximately $48,000 of the approximately $52,000 uncollected accounts receivable, indicated they would not pay for goods delivered. It was at this time that Debtor decided to close shop. Vermont Wood purchased the materials needed to perform the Tech Furnishings contract. Vermont Wood's fifty percent shareholder, Jacobson, provided the financial investment necessary to perform the Tech Furnishings order. Jacobson was unwilling to invest in Debtor because of its precarious financial condition. Vermont Wood then entered into a consignment agreement with Debtor and paid Debtor to manufacture the Tech Furnishings order. Vermont Wood paid Debtor for its services. Subsequently, Debtor and Chittenden engaged in a loan workout plan by liquidating the collateral and minimizing the deficiency. The workout plan had the same effect upon unsecured creditors as a chapter 7 liquidation, because Chittenden had a perfected security interest in the collateral. This court finds nothing unusual in the facts of this case to warrant piercing the corporate veil.

### IV. *Prejudice to Chittenden*

Marshaling of assets is an equitable doctrine that will only be applied when it will not cause undue prejudice to the senior creditor or third parties. *See Meyer v. United States*, 375 U.S. 233, 237–39, 84 S.Ct. 318, 321–22, 11 L.Ed.2d 293 (1963). The doctrine "is applied only when it can be equitably fashioned as to all of the parties" who have an interest in the property involved. *Id.* at 238, 84 S.Ct. at 321.

In this case, Chittenden will be prejudiced by having to abandon liquid collateral to proceed against a personal guaranty. *See Matter of Woolf Printing Corp.*, 87 B.R. 692, 694 (Bankr.M.D.Fla. 1988); *In re United Retail Corp.*, 33 B.R. 150, 153–54 (Bankr.D.Haw.1983); *In re Plad, Inc.*, 24 B.R. 676, 680 (Bankr. M.D.Tenn.1982); *In re Leonardo*, 11 B.R. 453, 455 (Bankr.W.D.N.Y.1981). *But see Tampa Chain*, 53 B.R. at 780. In addition, marshaling would reduce Chittenden's collateral pool on the Winers' personal loans by approximately $150,000.[11] Thus, there is an increased risk that Chittenden will not obtain full payment on all of its loans to David Winer. *See Victor Gruen Assocs. v. Glass*, 338 F.2d 826, 830 (9th Cir.1964).

### *Conclusion*

For the reasons stated above, this court reverses the marshaling order of the bankruptcy court and remands the case for further proceedings in accordance with this opinion.

So Ordered.

---

11. The bankruptcy court concluded that David Winer has sufficient assets to meet both his personal and corporate debts with Chittenden. *See Vermont Toy*, 82 B.R. at 331. Chittenden, however, argues persuasively that David Winer has insufficient assets to satisfy all of his loans. *See* Brief for Appellant at 58–62. An adversary proceeding would certainly assist in the proper determination of this question. *See Vermont Toy*, 82 B.R. at 283 (bankruptcy court forced to "assume" there are no mortgages on David Winer's home).