**In re ROBERT E. DERECKTOR OF RHODE ISLAND, INC., d/b/a Derecktor Shipyard.**

**Bankruptcy No. 92–10015.**

United States Bankruptcy Court, D. Rhode Island.

Feb. 2, 1993.

Allan Shine, Winograd, Shine & Zacks, P.C., Inc., Providence, RI, for debtor.

John P. Gyorgy, Adler, Pollock & Sheehan Inc., Providence, RI, for Rhode Island Port Authority and Economic Development Corp.

Richard M. Peirce, Roberts, Carroll, Feldstein & Peirce, Inc., Providence, RI, for United Steelworkers of America.

Jason Monzack, Kirshenbaum & Kirshenbaum, Cranston, RI, for Unsecured Creditors' Committee.

Charles L. Glerum, Choate, Hall & Stewart, Boston, MA, for F.D.I.C.

Robert D. Wieck, MacAdams & Wieck Inc., Providence, RI, for Paramax Systems Corp.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Robert E. Derecktor of Rhode Island, Inc., which for approximately 13 years had conducted a ship building and repair facility in Portsmouth, Rhode Island, filed a Chapter 11 petition on January 3, 1992. Since the filing the Debtor has operated in varying but limited fashion, and is presently in the final stages of total liquidation, with no future operations contemplated.

Before us is the Rhode Island Port Authority's Motion for Adequate Protection, wherein it asks this Court to order marshaling as to Federal Deposit Insurance Corporation's (FDIC) interest in the Debtor's assets. Several unsecured creditors oppose the relief sought by the Port Authority on the ground that to allow marshaling would diminish or wipe out any dividend they might otherwise receive. At the November 24, 1992 hearing on the motion, no evidence was presented, and although the oral arguments focused on the question of marshaling, several additional issues have been raised in the written submissions.

## FACTS

The relevant facts, as they appear below, are not in dispute: On April 13, 1979, the Port Authority loaned Derecktor $6,500,000 for the acquisition of facilities and equipment to be used in its ship building and repair business. As collateral for the loan the Port Authority retained a security interest in all of Derecktor's then owned and after acquired fixtures, furniture, furnishings, equipment, machinery, inventory, and other tangible personal property. As of February 15, 1992, the Debtor owed $4,975,000 to the Port Authority on the original obligation.[1]

On October 23, 1987, to purchase a 20,000 ton floating dry dock (Dry Dock III), Derecktor borrowed $6.5 Million from, and executed a purchase money security mort-

---

**1.** The dates and amounts are taken from Rhode Island Port Authority & Economic Development Corporation's Motion for Adequate Protection, which are uncontradicted and presumed to be accurate.

gage to Bank of New England–Old Colony. As additional collateral, Derecktor granted the bank a security interest in all of its presently owned and after acquired machinery, docks, equipment, inventory, personal property, and general intangibles. As of February 6, 1992, approximately $5.8 Million was due on this loan.

On December 21, 1988, Bank of New England loaned Derecktor $2,500,000 more, and received a security interest in Debtor's accounts, contracts, contract rights, inventory, and equipment. This security interest also covered the balance due on the original $6.5 Million loan. As of February 6, 1992, approximately $1.2 Million remained due on the December 1988 loan. When Bank of New England was deemed insolvent, FDIC became its successor-in-interest, entitling it to payment under Derecktor's obligations to Bank of New England.

As is evident, both FDIC and the Port Authority have a security interest in some of the same collateral, namely the equipment, inventory, machinery, and Dry Dock III. FDIC has the senior secured position on Dry Dock III, and it has the only security interest in the Debtor's intangibles, accounts, contracts, and contract rights. The Debtor's major assets include: (1) Dry Dock III; (2) an assignable tug boat contract (the Assignment); (3) a claim against Insurance Company of North America (INA Settlement); and (4) equipment, machinery, and inventory. The parties have agreed to liquidate the assets in the most efficient manner, and to defer the resolution of the marshaling issue pending the disposition of the assets.

Dry Dock III, the first asset liquidated, was sold in July, 1992 for $6.6 Million. The Tug Assignment and the INA Settlement were both approved on September 25, 1992, producing approximately $2.1 Million from the Assignment, and $650,000 from the INA Settlement.[2] The equipment, machinery, and inventory were sold in January, 1993, and proceeds were approximately $1.0 Million.

In the normal course, i.e. without marshaling, because Dry Dock III was the first asset liquidated, FDIC would apply the entire $6.6 Million against its $7.0 Million secured claim. The balance of its claim would then be satisfied from the proceeds of the Tug Assignment, and thereafter the funds remaining from the Assignment and INA Settlement would be used to pay junior secured creditors, and finally unsecured creditors. Again, without marshaling, the Port Authority's security interest would extend only (after the Dry Dock III proceeds go to FDIC) to the equipment, machinery, and inventory and therefore, it would recover, at best, $1.0 Million of its $5.0 Million claim. Through marshaling however, the Port Authority can realize the benefit of its second secured position on Dry Dock III, with FDIC looking first to the INA Settlement and the Assignment for payment, and thereafter to Dry Dock III, leaving a surplus for junior lienors.

## DISCUSSION

■ Before addressing the marshaling argument we will discuss the various perfection issues raised. First, unsecured creditor Paramax Systems Corporation (Paramax) disputes the validity of the Port Authority's lien on Dry Dock III, on the ground that the dry dock is not a "vessel." We find no merit in that contention. Dry Dock III was certificated as a "vessel" by the United States Coast Guard on December 22, 1987, and thereafter, the Port Authority duly perfected its ship mortgage by recording in the office of the United States Coast Guard, on November 7, 1988. *See Chase Manhattan Fin. Servs. v. McMillian,* 896 F.2d 452, 458 (10th Cir.1990); *Merchants Nat'l Bank v. The Ward Rig No. 7,* 634 F.2d 952 (5th Cir.1981). Thus, we hold that the Port Authority has a valid, perfected security interest in Dry Dock III, subject to the first secured lien of FDIC.

■ Next, the Unsecured Creditors' Committee argues that FDIC does not have a perfected security interest in the pro-

---

**2.** The INA Settlement totaled $2.5 Million, however, $1,850,000 has been set aside to satisfy Miller Act claims. Funds remaining after determination of those claims will revert to the estate.

ceeds of the INA Settlement, because its interest never attached to those funds. We disagree. The December 21, 1988 security agreement between the Debtor and Bank of New England included, under the definition of collateral: "all Accounts, Inventory and Equipment, General Intangibles (as defined in the UCC)...." A financing statement filed the same day contains an identical description of the collateral. Under the Uniform Commercial Code, general intangibles are defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money." UCC § 9–106. Applying this definition to the situation at hand, we rule that the Debtor's interest in the INA Settlement is a chose in action to which the FDIC's security interest attached, and that FDIC, as successor-in-interest to Bank of New England, has a perfected security interest in the proceeds of the INA Settlement.

■ The remainder of the present dispute concerns the propriety of applying the doctrine of marshaling to the facts before us. Marshaling is an equitable doctrine which "rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Sowell v. Federal Reserve Bank*, 268 U.S. 449, 457, 45 S.Ct. 528, 530, 69 L.Ed. 1041 (1925). The purpose of the doctrine is to "prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293 (1963). Equity requires the senior creditor to look first to property which cannot be reached by the junior creditor, but only if the senior creditor or third parties are not prejudiced. *In re Beacon Distribs., Inc.*, 441 F.2d 547, 548 (1st Cir.1971); *Meyer*, 375 U.S. at 237, 84 S.Ct. at 321. A bankruptcy court has the authority under its equity jurisdiction to order the marshaling of funds. *Canal Nat'l Bank v. Larry's Equip. Serv., Inc.*

*(In re Larry's Equip. Serv.)*, 23 B.R. 132, 133 (Bankr.D.Me.1982).

■ To apply the marshaling doctrine, three elements must be present: (1) the existence of two creditors of the Debtor; (2) the existence of two funds owned by the Debtor; and (3) the ability of one creditor to satisfy its claim from either or both of the funds, while the other creditor can only look to one of the funds. *Exchange Bank v. South Carolina Nat'l Bank (In re Dig It, Inc.)*, 129 B.R. 65, 67 (Bankr.D.S.C. 1991); *Peoples Bank v. The Computer Room, Inc. (In re The Computer Room)*, 24 B.R. 732, 734 (Bankr.N.D.Ala.1982).

The instant controversy falls squarely within these requirements: (1) FDIC and the Port Authority are two creditors of the Debtor; (2) there are (more than) two funds of the Debtor available for these creditors, i.e. sale proceeds from Dry Dock III, the Assignment, the INA Settlement, and the equipment, machinery, and inventory; and (3) FDIC can satisfy its claim from *all* of the Debtor's funds, while the Port Authority can only look to Dry Dock III and the equipment, machinery, and inventory for payment.

■ The unsecured creditors object to the application of the doctrine on the ground of prejudice, in that marshaling will give the Port Authority more security than it originally bargained for. The FDIC's claim is roughly $7.0 Million, which would be almost entirely satisfied from the proceeds of the Dry Dock III sale. If FDIC were paid these proceeds, the Port Authority's recovery on its $5.0 Million claim would be limited to approximately $1.0 Million from the sale of the equipment and machinery, and the balance of its claim would be rendered unsecured. However, if FDIC is required to look first to the proceeds from the Assignment and the INA Settlement before looking to Dry Dock III, the Port Authority will receive an additional $2.0 Million on its secured claim. While it is clear that marshaling in this manner will deplete the fund otherwise available to unsecured creditors, we do not find such a

result to constitute *legal prejudice,* in the marshaling context.[3]

The history and intended purpose of the doctrine, as well as a review of the more recent cases addressing the issue, supports this conclusion. Historically, marshaling has been applied for the benefit of the junior secured creditor by preserving its collateral through a court established order of distribution of secured assets. *Whirlpool Corp. v. Plad, Inc. (In re Plad, Inc.),* 24 B.R. 676, 679 (Bankr.M.D.Tenn.1982); *First City Nat'l Bank v. Mid–West Motors, Inc. (In re Mid–West Motors),* 82 B.R. 439, 443 (Bankr.N.D.Tex.1988); *Craner v. Marine Midland Bank (In re Craner),* 110 B.R. 111, 123 (Bankr.N.D.N.Y.1988), *rev'd on other grounds,* 110 B.R. 124 (N.D.N.Y. 1989); *In re Atlas Commercial Floors, Inc.,* 125 B.R. 185, 188 (Bankr.E.D.Mich. 1991). This is accomplished by requiring the senior secured creditor to look first to its single interest collateral, i.e. property that the junior secured creditor cannot reach, before looking to the shared collateral to satisfy its claim, and this of course invariably results in a diminution of the funds available for unsecured creditors. *See In re Dealer Support Servs. Int'l,* 73 B.R. 763, 764 n. 1 (Bankr.E.D.Mich.1987); *Federal Land Bank v. Tidwell (In re McElwaney),* 40 B.R. 66 (Bankr.M.D.Ga. 1984); *In re Mid–West Motors* at 443; *In re The Computer Room* at 737. If we were to accept the unsecured creditors' argument regarding prejudice, the doctrine of marshaling would rarely, if ever, be utilized in bankruptcy because its application almost always results in diminished assets for the unsecured creditors.

In support of their position, the unsecured creditors rely on *In re Center Wholesale, Inc.,* 759 F.2d 1440 (9th Cir. 1985), and *Berman v. Green (In re Jack Green's Fashions for Men—Big & Tall, Inc.),* 597 F.2d 130 (8th Cir.1979). Both cases, however, have been criticized as improperly extending the traditional scope of the marshaling doctrine. *See Chittenden*

Trust Co. v. Sebert Lumber Co. (In re Vermont Toy Works), 82 B.R. 258, 315–16 (Bankr.D.Vt.1987), *rev'd on other grounds,* 135 B.R. 762 (D.Vt.1991) (and cases cited therein); Note, *Marshaling Assets in Bankruptcy: Recent innovations in the Doctrine,* 6 Cardozo L.Rev. 671, 687–88 (1985); *Western Farm Credit Bank v. Teresi (In Re Teresi),* 134 B.R. 392, 397 n. 1 (Bankr.E.D.Cal.1991).

The Court in *In re Jack Green's Fashions for Men—Big & Tall, Inc.,* allowed the trustee in bankruptcy, as a hypothetical lien creditor, to marshal the Debtor's assets for the benefit of unsecured creditors. Similarly, the Court in *In re Center Wholesale,* allowed a debtor-in-possession, as hypothetical lien creditor, to block a request for marshaling that caused "injustice" to the estate. As much as we may empathize with the adverse impact caused to the unsecured creditors here, we are now unwilling to follow the above cases, and feel compelled to adhere to the view that requires marshaling in favor of a junior *secured* creditor (here, the Rhode Island Port Authority).

The Port Authority bargained for security on its loan, whereas the unsecured creditors did not, and this allows the *junior secured* creditor to realize the benefit of its bargain. The caveat against causing harm or prejudice to others applies only to parties having equity *equal* to the party seeking to invoke marshaling. As the Supreme Court in *Meyer* stated,

[Marshaling] deals with the rights of all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties. Thus, state courts have refused to apply it … where the rights of third parties having equal equity would be prejudiced.

*Meyer,* 375 U.S. at 237, 84 S.Ct. at 321 (citations omitted); *See also* 53 Am.Jur.2d *Marshaling Assets* § 14 (stating marshal-

---

**3.** Although we have previously decided this issue differently, in *In re Designed Ventures, Inc.,* BK Nos. 89–10605—89–10610, (Bankr.D.R.I. March 23, 1990), upon review of the more recent authorities on the subject and reconsidera-

tion of the *In re Center Wholesale, Inc.,* 759 F.2d 1440 (9th Cir.1985) case, we no longer feel that it represents the correct view and accordingly, to the extent that our ruling herein is inconsistent, *Designed Ventures* is reversed.

ing will not be applied when doing so would impair a *superior or equal* equity of another person). Here, the parties do not stand on equal footing—the Port Authority's rights as a secured creditor are legally superior to those of the unsecured creditors, and accordingly the "prejudice" argument does not apply in this instance.

Finally, Paramax argues that marshaling at this juncture is inappropriate because other assets of the Debtor *may* be uncovered, such as recovery on the guarantees of the Debtor's parent and its principal shareholder. Without speculating as to the merits of these potential assets, we find that such guarantees do not meet the "two funds" requirement of marshaling. *See In re Plad* at 679; *In re Beacon Distributors* at 548–49; *In re Computer Room* at 737; *In re Vermont Toy Works* 135 B.R. 762, 772–73. Therefore, the potential realization of such funds will not affect our decision today.

Accordingly, based upon all of the foregoing, the Port Authority's Motion for Adequate Protection, requesting FDIC to marshal its interest in Debtor's assets, is GRANTED. Since certain of the described assets have been liquidated, and FDIC has already received payment of the proceeds from the sale of Dry Dock III, it is ORDERED that FDIC's secured position in the Debtor's contracts, contract rights, accounts receivable, and general intangibles remain in effect, pending the collection of all proceeds of the liquidation. Thereafter, FDIC is ordered to recover the balance of its claim from the proceeds of its single interest collateral, prior to being paid from any proceeds of the shared collateral.

Enter Judgment consistent with this opinion.