M.O.C. Inc. v. Main St. Landing, No. S0720-02 Cnc (Katz, J., May 10, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                         SUPERIOR COURT
Chittenden County, ss.:                                Docket No. S0720-02 CnC

M.O.C., INC.

v.

MAIN STREET LANDING CO.

ENTRY

Defendant Main Street Landing seeks to pare down the claims against it by M.O.C., Inc.  To that end, it has moved for partial summary

judgment on the basis that there is no evidence to support the plaintiff's claims of defamation and breach of the covenant of good faith and fair dealing. Main Street also argues that this dispute is between itself and M.O.C. and should not involve either Melinda Moulton or Manon O'Connor. As each argument raised by Main Street deals with a discrete issue, we will address them individually.

We begin by incorporating our January 13, 2004 and February 26, 2004 entry, which summarized the relevant facts in this case. Briefly, M.O.C., a company owned by Manon O'Connor, seeks damages resulting from actions taken by Main Street, its landlord, in violation of their lease agreement. Primarily these are for the collapse of M.O.C.'s business as a result of Main Street locking M.O.C. out of the premises.

## Breach of Lease

Main Street seeks to remove Manon O'Connor as a plaintiff in the breach of contract claim stemming from the lease. It argues that, since O'Connor was neither a party to the lease nor an expressly named beneficiary, she lacks standing to bring an action to enforce its terms. This proposition is supported by well-established contract law, which holds that a stranger to an agreement cannot sue for breach unless the parties to the contract intended it to directly benefit the stranger. Robins Dry Dock Repair Co. v. Flint, 275 U.S. 303, 307 (1927) (Holmes, J.) (quoting German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)); see also Restatement (Second) of Contracts § 315.

Such a direct beneficiary is called an intended beneficiary and is contrasted with an incidental beneficiary, who may reap some benefit from the contract but was not an intended by the parties to be the beneficiary.

Restatement (Second) of Contracts § 302 cmt. e. Discerning between an incidental and intended beneficiary is a matter of contract construction. 17A Am. Jur. 2d Contracts § 448. This means looking to the language of the lease to determine if the parties intended to make O'Connor a direct beneficiary of the lease. As O'Connor concedes, she was neither a party to the lease nor an explicit beneficiary. However, she argues that her interest in the lease, as owner of M.O.C. was so intertwined that she is clearly implied beneficiary.

We disagree with O'Connor's argument. At the time that the parties signed the lease, O'Connor, her husband, and Main Street chose to make the M.O.C. corporation a party and not the O'Connors individually. By doing so the O'Connors limited their liability on the lease to their corporate identity. Just as Main Street could not have sued to enforce the lease against either of the O'Connors, so too is O'Connor prevented from slipping out of her corporate identity to bring an action in breach. As one Federal Court wrote of this situation:

> [W]hen one creates a corporation as the sole shareholder and uses the corporation to sign contracts, the person is using the corporation as a shield from individual liability. To allow that individual to sue on a contract signed only by the corporation would be to allow that person the benefits of a corporation without the limitations. If one wishes to preserve the right to sue as an individual in this situation, one may sign the contract as an individual.

Amesco Exports, Inc. v. Associated Aircraft Manufacturing & Sales, Inc., 977 F. Supp. 1014, 1016 (C.D. Cal. 1997) (vacated on other grounds by, Amesco Exports, Inc. v. Associated Aircraft Mfg. & Sales, Inc., 87 F.Supp. 2d 1013 (C.D.Cal. 1997)).

To bolster her argument, O'Connor cites deposition testimony and other evidence showing Melinda Moulton, on behalf of Main Street, referring to O'Connor personally whenever she intended to identify M.O.C. For example, O'Connor cites to e-mails that Moulton sent saying, "when [O'Connor] refused to pay rent—we served her on default . . .and she still refused to pay. So what were we to do. We locked her out and took back the space." Pl. Supp. Mem. in Opp'n to Def. Mot. for Partial Summ. J., at Ex. G (Dec. 3, 2004). This, she argues, establishes that Main Street always considered her a party to the lease. There are two reasons why this evidence does not change the outcome. First, parties intentions are gleaned from the contract and the circumstances surrounding its formation and not testimony given years after the lease was formed. Isbrandtsen v. North Branch Corp., 150 Vt. 575, 577–78 (1988). Second, this statement cited by O'Connor, merely anthropomorphizes a closely held corporation into its majority shareholder. This proves only that M.O.C., Inc. and O'Connor were closely associated with each other, but it does not prove that the parties, at the time when they made the lease, intended O'Connor to be a party or a direct beneficiary of the lease. The problem here is that, while M.O.C. and O'Connor share some interests, the mere alignment of interests does not create a direct benefit. Rather it is what the parties intend to create when they draft the agreement. Restatement (Second) of Contracts § 302. Here, parties limited themselves to their corporate identities and made no provision to retain either liability or a right to claim breach of contract. O'Connor did receive some benefit from the lease but this benefit was incidental to the agreement and was not the direct purpose, which was to benefit M.O.C. and Main Street. 13 R. Lord, Williston on Contracts § 37:1, at 9 (2000). Therefore, O'Connor is an incidental beneficiary and cannot be a party to the contract claims for lack of standing.

## Moulton Liability

Main Street next seeks to remove Moulton as a party to this case because all of her actions were done as a corporate officer. In this respect, our previous analysis of third-party beneficiaries applies equally to Moulton. Since she was neither a party to the lease nor an intended beneficiary, she cannot be liable for breach of contract. M.O.C. does not explicitly disagree with this conclusion but, nevertheless, seeks to make Moulton liable for her wrongful conduct.

The main thrust of M.O.C.'s argument seeks to hold Moulton liable by "piercing the corporate veil" and reaching out to her individually. M.O.C. urges us to take this action because allowing her to hide behind the corporate shield would frustrate the ends of justice, namely attaching Moulton to this case to hold her responsible for her alleged wrongdoing. While this argument may tap into what M.O.C. feels is the equity of the situation, it does not in-and-of-itself justify piercing the corporate veil in this case. Agway, Inc. v. Brooks, 173 Vt. 259, 263 (2001) (courts will pierce the corporate veil where "fairness, equity, and the public need" require). When a court pierces the corporate veil, the court is essentially ignoring the corporate structure with its inherent limitation on liability because the owners and officers of the corporation through underfinancing or fraudulent behavior have abused the corporate form and behaved outside the corporate structure. Id. (citing In re Vt. Toy Works, Inc., 135 B.R. 762, 770 (D. Vt. 1991)). This is an extraordinary measure for a court to take and must be justified by some abuse of the corporate structure rather than any general negligence or wrongdoing by an officer. R. Thompson, Piercing the Corporate Veil: An Empirical Study, 76 Cornell L. Rev. 1036, 1041 (1991). Here there is simply no evidence that either Moulton or Main

Street abused the corporate structure, acted ultra vires to the business' purpose, or disregarded the corporate structure in anyway that would justify treating them outside their roles as officers, directors, and shareholders.

Instead, Moulton's potential liability comes from the more ordinary route of officer liability. It is a general rule that an officer of a company, even one acting in an official capacity, is liable only for the torts that she personally commits. 3A W. Fletcher, <u>Fletcher Cyclopedia of the Law of Corporations</u> § 1135 (2002). Conversely, an officer is not liable for the torts of a corporation merely by virtue of her office. <u>Id</u>. at § 1137; see also <u>Bowling v. Ansted Chrysler-Plymouth-Dodge, Inc.</u>, 425 S.E.2d 144, 148–49 (W.Va. 1992) (collecting cases). This is the doctrine of corporate officer liability. See generally C. Fain, <u>Corporate Director and Officer Liability</u>, 18 U. Ark. Little Rock L.J. 417 (1996) (discussing the limits of corporate duties and liabilities for individuals).

Even though the evidence shows that this lock-out was a corporate, rather than a personal, action. Moulton, as the human decision-maker who authorized the lock-out, may be personally liable to the extent that her action was a tort. This is not to say that the lock-out was a tort-per se. It was not. Much of our previous decision focused on the wrongfulness of the action within the context of the landlord-tenant relationship. See <u>M.O.C., Inc. v. Main Street Landing</u>, No. S0720-02 CnC (Katz, J. Jan. 13, 2004) (explaining that the lock-out was improper in the context of the viable tenancy). Such wrongfulness does not make Moulton liable to M.O.C. M.O.C.'s third claim of intentional interference with prospective business relations alleges a slightly different source of tort liability. This claim is premised on the fact that Moulton knew her decision would effectively end M.O.C.'s business and that by ordering the lock-out she effectively ended

any opportunity M.O.C. had to either sell or carry on its business.

Main Street argues that this claim should be dismissed for a lack of evidence since M.O.C. did not have a prospective purchaser.  This is a valid argument so far as M.O.C. claims interference with its ability to sell the restaurant.  M.O.C. has no evidence that it had any potential buyers or interested prospects.  While it is possible, it may have found a buyer for its financially troubled restaurant business, it has not shown where it was probable.  Although the tort of intentional interference with prospective business relations does not require that the prospect be reduced to a contractual right, it does require a specific rather than a speculative prospect.  See generally 2 D. Dobbs, <u>The Law of Torts</u> § 450 (2001) (discussing cases that have balanced interference claims based on probable prospects with a defendant's inherent right to act).  To the extent that M.O.C.'s claim corresponds to lost business and encompasses its attempt to maintain its restaurant business, M.O.C. can support its claim, at least for the purposes of summary judgment, with its reservations and history of steady, albeit irregular, business history.  To the extent that M.O.C.'s argument is a claim for these losses as a result of the lock-out, it satisfies its burden for summary judgment and the claim against Moulton cannot be dismissed.

## Breach of the Covenant of Good Faith & Fair Dealing

Main Street argues that M.O.C. has failed to present any evidence that Main Street breached the covenant of good faith and fair dealing.  This covenant is implied in all contracts and states that "each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement."  <u>Carmichael v. Adirondack Bottled Gas Corp.</u>

of Vt., 161 Vt. 200, 208 (1993).  This standard allows a claim where plaintiffs can establish some evidence that the other party acted in "bad faith" and in a way that violated "community standards of decency, fairness or reasonableness."  Id. at 209 (quoting Restatement (Second) of Contracts § 205); see also  T. Diamond & H. Foss,  Proposed Standards for Evaluating When the Covenant of Good Faith and Fair Dealing Has Been Violated: a Framework for Resolving the Mystery, 47 Hastings L.J. 585, 590–93 (1996) (criticizing this particular approach as vague and unpredictable).  In this case, M.O.C. alleges that Main Street acted in bad faith when it wrongfully locked it out of the premises, knowing that a lockout would mean the end of M.O.C.'s business.

This claim, however, fails to met the criteria for a good-faith-and-fair-dealing claim.  Essentially, M.O.C. is arguing a consequential damage of the breach of contract as a separate tort.  As defined in the Restatement (Second) of Contracts, the covenant of good faith and fair dealing is a promise not to undercut the other party's intentions.  See Restatement (Second) of Contracts § 205 cmt. d (citing examples of bad faith).  As an example the Restatement gives the following illustration:

> 2. A, owner of a shopping center, leases part of it to B, giving B the exclusive right to conduct a supermarket, the rent to be a percentage of B's gross receipts. During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket. Unless such action was contemplated or is otherwise justified, there is a breach of contract by A.

While plaintiffs are not limited by the factual scenario of the illustration, the illustration and cases like Carmichael establish a much

more limited cause of action.  Carmichael, 161 Vt. at 208.  In Carmichael, the plaintiffs complained that Adirondak Gas had unfairly terminated their business relationship.  Id.  This was in violation of the evidence that demonstrated the parties owed each other a duty beyond the contract to wind business down.  This additional duty was dependant on the type of business (propane supply business) and the nature of their termination (a winding down of affairs).  Id.  Like illustration 2 from the restatement, Carmichael hinges upon a violation of the spirit and purpose of the contract without technically violating it.  In this case, parties were in a difficult relationship with each other and Main Street had a concern about M.O.C.'s continued viability and its ability to maintain the property with rent.  Whether or not Main Street acted inappropriately by locking M.O.C. out, is irrelevant to the question of good faith and fair dealing.  It acted in its own interests, which only secondarily violated M.O.C.'s interest.

This is the major feature that distinguishing the present case from § 205 and Carmichael.  If a party acts with bad faith and breaches the contract, the non-breach party has a remedy through an action for breach of contract and possibly for punitive damages.  To then add another cause of action merely because the breach violated the non-breaching parties would open parties up to liability not based on their actions but the effect of the breach.  That is, if a breach went against a non-breaching party's interest—and the question is When does it not?—then the breaching party would be liable in both tort and contract for the same activity and not based on the party's actions but its effect.  As a limiting principle, we find that Carmichael and the Restatement, allow for such a limitation where appropriate.  See also Diamond & Foss, supra, at 600–01 (suggesting that such claims are limited to dishonesty and commercial unreasonableness).  While Main Street's actions may have breached its lease with M.O.C. and

caused such consequential damages as loss of business, its actions did not in and of themselves breach the covenant of good faith and fair dealing. Therefore, M.O.C.'s claim for such a breach is dismissed.

## Defamation

Main Street's final argument is that O'Connor has not established a claim for defamation stemming from the Moulton e-mail. In that e-mail, Moulton told another person that: "when [O'Connor] refused to pay rent— we served her on default . . .and she still refused to pay. So what were we to do. We locked her out and took back the space." Pl. Supp. Mem. in Opp'n to Def. Mot. for Partial Summ. J., at Ex. G (Dec. 3, 2004). O'Connor argues that this claim has been proven by our previous rulings on the question of whether she paid rent. O'Connor misinterprets our previous entries in this case. In those, we ruled only that the notice to quit that Main Street gave was insufficient as a matter of law to support the lock-out. We did not rule that she did or did not pay rent. In fact, the evidence shows that M.O.C. did not pay rent at various times and that its struggling fiscal circumstances led to the tensions between the parties and the eventual lock-out. Truth always defeats a cause of action for defamation and is a complete defense. Lent v. Huntoon, 143 Vt. 539, 548 (1983). Based on the veracity of Moulton's e-mail, there is no cause for a defamation claim in the evidence presented. Poplaski v. Lamphere, 152 Vt. 251, 254–55 (1989). Therefore, O'Connor's claim for defamation is dismissed.

## Conclusion

Based on the foregoing, defendant Main Street's motion for partial summary judgment is granted. Plaintiffs M.O.C. and O'Connor's claims for defamation and breach of the covenant of good faith and fair dealing are dismissed. O'Connor is removed as a party to the breach of contract claim, and Moulton's liability is limited to her tortious behavior.

Dated at Burlington, Vermont_____, 2005.