## In re BLONDHEIM REAL ESTATE, INC., Debtor.

### Bankruptcy No. 85-221.

United States Bankruptcy Court, D. New Hampshire.

Sept. 16, 1988.

Joseph Foster, Manchester, N.H., for Creditors' Committee.

Daniel Callaghan, Manchester, N.H., for trustee.

R. Timothy Phoenix, Portsmouth, N.H., for Equity Committee.

## MEMORANDUM OPINION ON MOTION FOR SUBORDINATION OF NOTE-HOLDER CLAIMS TO TRADE CREDITOR CLAIMS

JAMES E. YACOS, Bankruptcy Judge.

On August 8, 1988 the United States Trustee filed in this chapter 11 reorganization proceeding a "Motion For Subordination Of Investor Claims To Trade Creditor Claims" in which she sought an order determining that "the claims of unsecured creditors who invested in debtors' notes be subordinated to the claims of trade creditors." Because of the pendency of a complex plan of reorganization, which shortly awaits approval of a fourth amended disclosure statement involving a fourth amended plan of reorganization, the aforesaid motion of the U.S. Trustee was heard on an expedited schedule before this court on September 13, 1988. The U.S. Trustee's motion, if granted, would conflict with the classification of claims provided in the pending plan of reorganization, and would necessitate a further revision of the plan before it could be submitted to creditors and equity-holders for approval.

The motion as originally filed relies on both § 510(b) and § 510(c) of the Bankruptcy Code as justification for the requested relief. However, at the hearing on September 13, 1988 the U.S. Trustee withdrew the § 510(c) contention in open court. This removes the equitable subordination issue under § 510(c) which involves various factual questions now not necessary for decision.[1]

Accordingly the sole issue before this court for decision is a question of law as to whether subordination is mandatory under the following particular provision of § 510(b) of the Code:

> For the purpose of distribution under this title, a claim ... for damages arising from the purchase or sale of [a security of the debtor] ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest repre-

---

1. There also would have been a serious procedural question had § 510(c) remained before the court, inasmuch as the U.S. Trustee did not seek to serve all affected noteholders with an appropriate motion or adversary proceeding seeking subordination of their claims on that ground.

sented by such security, except that if such security is common stock, such claim has the same priority as common stock.

The quoted language follows an earlier clause directing subordination of claims "arising from rescission" of a purchase or sale of a security.[2]

Assuming without deciding that the U.S. Trustee has standing to pursue a motion for subordination in a chapter 11 case,[3] I note that her position is bottomed basically upon her reading of the statutory words "security" and "damages" in the statute involved. I agree with her contention as to the former but disagree as to the latter.

There is no question that each note issued by the debtor in this case constituted a "security" within the meaning of the statutory language. *See* 11 U.S.C. § 101(43) (definitional provision). There is considerable question however with regard to the "damages" contention as will be developed below.

The U.S. Trustee reads "damages" to include the claim for recovery of the liquidated, unpaid amount due and owing *on the instrument itself, i.e., the promissory note,* even though the claimant is not claiming any further consequential or other damages caused by the failure to repay the note when due.

The Bankruptcy Code does not define "damages" and the legislative history with regard to § 510(b) (enacted as part of the 1978 Bankruptcy Code) also gives no indication as to any special meaning to be accorded to that word in the statute. Turning to a recognized legal dictionary, we find "Damages" defined as follows:

A pecuniary compensation or indemnity, which may be recovered in the courts by any person who has suffered loss, detriment, or injury, whether to his person, property, or rights, through the unlawful act or omission or negligence of another. A sum of money awarded to a person injured by the tort of another. Restatement, Second, Torts, § 12A.

Damages may be compensatory or punitive according to whether they are awarded as the measure of actual loss suffered or as punishment for outrageous conduct and to deter future transgressions. Nominal damages are awarded for the vindication of a right where no real loss or injury can be proved. Generally, punitive or exemplary damages are awarded only if compensatory or actual damages have been sustained.

Compensatory or actual damages consist of both general and special damages. General damages are the natural, necessary, and usual result of the wrongful act or occurrence in question. Special damages are those "which are the natural, but not the necessary and inevitable result of the wrongful act." [*Black's Law Dictionary,* 351–52 (5th ed. 1979)]

It is apparent from this definition, and I believe from common legal parlance, that the concept of "damages" has the connotation of some recovery *other than* the simple recovery of an unpaid debt due upon an instrument.[4]

The legislative history makes it clear that § 510(b) was enacted as a result of the thorny question which had caused conflicts in the courts as to whether an equity security-holder alleging fraud in the purchase of the security could share on the resulting fraud claim on an equal basis with general unsecured creditors—as opposed to the inferior position of equity holders. *See Mat-*

---

**2.** There is no reliance by the U.S. Trustee on the alternative "rescission" language in the present case.

**3.** The U.S. Trustee cites 28 U.S.C. § 586(a) and 11 U.S.C. § 307 in that regard.

**4.** Indeed as the creditors' committee points out in its memorandum, under New Hampshire common law pleading an action upon the instrument itself would have to be an "Action in

Debt" and an action for a fraudulent sale of a security would be a tort action as a "Trespass On The Case" under New Hampshire practice. Newhall, J.B., *Justice And Sheriff,* pp. 78–79, 95, 101 (1931). The committee notes further: "An Action in Debt is the same claim a trade creditor could bring for nonpayment. Both involve claims for liquidated amounts; an Action for Trespass On The Case involves a claim for an unliquidated sum."

ter of *Stirling Homex Corp.*, 579 F.2d 206 (2nd Cir.1978).

The pertinent legislative history appears in House Report No. 95–595, at pages 194–196, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6154–6157, under the heading "Subordination Of Security Purchase Decision Claims", and is entirely focused upon the question of appropriate treatment of *inferior-level* claims that arguably might be *upgraded* to a higher level by virtue of some fraud ground justifying recovery by the security holder against the debtor. There is no discussion whatsoever in the legislative history as to priority questions between "trade creditors" and "investors" who are *same-level* unsecured creditors to support the U.S. Trustee's reading of the statutory language.

The House Report reference above closes with the following comment:

> The bill generally adopts the Slain/Kripke position, but does so in a manner that is administratively more workable. The bill subordinates in priority of distribution rescission claims to all claims that are senior to the claim or interest on which the rescission claims are based. Thus, a rescission claim resulting from the purchase of a subordinated debenture would share in the proceeds of the estate before equity security holders but after general unsecured creditors. The bill also provides for some case-by-case adjustment. The court is given general authority to subordinate claims on equitable grounds. If those that would take before subordinated rescission claim holders had been involved in some activity that led to the fraudulent issue of the securities on which the rescission claims were based, the court would be able to subordinate those with dirty hands below the rescission claim holders, thus restoring the recision claim holders to nearly a creditor position.

Not surprisingly, all cases to date construing § 510(b) involve shareholder claims for rescission or damages based on fraudulent sale of securities. *See In re Stern–Slegman–Prins Co.*, 86 B.R. 994, 999–1000 (Bankr.W.D.Mo.1988).

The U.S. Trustee recognizes that the "rescission" language in the first portion of § 510(b) does not support her contention, but she argues that the additional "for damages arising" language must mean something more and can encompass the subordination of noteholders to trade creditors in the present case. My opinion however is to the contrary, since I believe that the "for damages arising" language has a more natural and obvious purpose of including within the statutory provision those *former holders* of securities who technically would not have a "rescission" claim (as present holders would have) but would still have a fraud claim at common law or as "Rule 10b–5" fraud claimants for damages under the Securities Exchange Act of 1934. *See* 17 C.F.R. 240.10b–5.

The U.S. Trustee also fastens upon the language in the House Report quoted above to the effect that "The bill generally adopts the Slain/Kripke position...." and apparently believes this reference somehow incorporates into the statutory language all comments included by Professors Slain and Kripke in the referenced law review article, *The Interface Between Securities Regulation And Bankruptcy—Allocating The Risk Of Illegal Securities Issuance Between Securityholders And The Issuer's Creditors*, in 48 N.Y.U. L.Rev. 261 (May 1973). However, a review of that article indicates that it too focuses on the fraud transaction context, and is no support for inferring a congressional intent to provide for mandatory subordination of noteholder or debentureholder unsecured creditor claims to trade creditor unsecured claims.

Moreover, the actual statutory language enacted, as indicated above, has a natural meaning which requires no strained interpretation of the "for damages arising" language to accomplish the fundamental change in priority distribution rules in bankruptcy reorganization proceedings that would result from upholding the U.S. Trustee's reading of § 510(b) of the Code.

The creditors' committee comments convincingly in its Memorandum as to certain clearly inappropriate results, far from any demonstrated Congressional intent, that

would follow from approval of United States Trustee's construction of § 510(b):

The position of the United States Trustee ignores basic assumptions made in business and commercial transactions. The contention that a trade creditor has priority because the unsecured lender holds a note is absurd. Two hypotheticals help illustrate this point. If the United States Trustee's position were adopted the undersecured portion of an secured creditor's claim would be subordinated to a trade creditor's claim. While presumably the secured creditor's lien on collateral would remain, any deficiency claim because it is evidenced by a note, would be subordinated to trade debt.

Similarly, a trade creditor that chooses to allow a slow paying debtor to issue a note and accepts payment over time would be prejudiced. If, after accepting the note the debtor filed bankruptcy, the trade creditor would be making a "claim on a note" and be subordinated to other trade creditors under the United States Trustee's theory. This obviously would be an unfair result—trade creditors who are dilatory pursing (sic) legal remedies would come ahead of creditors pursuing their rights. If adopted, the United States Trustee's position would discourage trade creditors from working with financially distressed debtors.

The United States Trustee argues that noteholders are really "investors" in the Blondheim entities and therefore subordination is fair. As support for her position she points to the "high" rates of interest note holders were receiving— four to five percent over prevailing rates for certificates of deposits. This argument ignores the fundamental difference between a certificate of deposit and an unsecured loan. Certificates of deposit are generally F.D.I.C. insured—risk of nonpayment does not exist. While individuals technically loan money to a bank when a certificate of deposit is purchased, it is the safest "unsecured" loan imaginable and therefore a lower rate of interest is paid. However, unsecured loans are typically made at a much higher rate of interest because risk of nonpayment is greater. For example, banks typically pay five percent on statement savings account, which are F.D.I.C. insured, but charge ten to eleven percent for 30–year fixed rate mortgages and 15–20% for loans made on credit cards. The higher rate of interest charged on unsecured loans does not convert debt instruments into equity instruments. No case subordinating unsecured loans or the undersecured portion of a secured loan to trade debt pursuant to Section 510(b) has been cited by the United States Trustee. Banks *are* sometimes equitably subordinated under Section 510(c), but not under Section 510(b). To adopt the United States Trustee's position would fundamentally change the understanding bankers and other lenders have about lending transactions.

In my judgment the mandatory subordination rule which the U.S. Trustee seeks to extract from the referenced language in § 510(b) of the Bankruptcy Code would be truly revolutionary and not within any required reading of the statutory language and its underlying legislative history. For all of the reasons set forth above, a separate order will be entered denying the U.S. Trustee's Motion To Subordinate.[5]

---

**5.** The U.S. Trustee has incorporated by reference with her Motion various prior pleadings and matters of record in this case with regard to prior hearings on consolidation and intercompany claims which were litigated between the parties before the presently pending consensual plan of reorganization was submitted. The withdrawal of the § 510(c) contention by the U.S. Trustee, at the September 13, 1988 hearing, as noted above, renders those factual contentions irrelevant inasmuch as the sole matter remaining for decision by this court involved the § 510(b) contention. The court in the *present decision expresses no view as to any possible application of § 510(c) in future cases* with regard to the unsecured trade creditor/unsecured noteholder context.