ORDERED PUBLISHED

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

In re:                            )
                                  )    BAP No.   CC-12-1340-KlPaDu
TRISTAR ESPERANZA PROPERTIES,     )
LLC, a California Limited         )    Bk. No.   SA 11-21095-TA
Liability Company,                )
                                  )    Adv. No.  SA 12-01041-TA
            Debtor.               )
_____   )
                                  )
JANE O'DONNELL; PENSCO TRUST      )
COMPANY, a New Hampshire          )
Company,*                         )
                                  )
            Appellants,           )
                                  )
v.                                )    **OPINION**
                                  )
TRISTAR ESPERANZA PROPERTIES,     )
LLC, a California Limited         )
Liability Company,                )
                                  )
            Appellee.             )
_____   )

Argued and Submitted on February 22, 2013
at Pasadena, California

Filed – March 8, 2013

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Theodor Albert, Bankruptcy Judge, Presiding

Before:  KLEIN,** PAPPAS, and DUNN, Bankruptcy Judges.

_____

* The caption is revised to reflect Jane O'Donnell as lead appellant and real party in interest. Pensco Trust Company is not separately represented and has not appeared in its own right.

** Hon. Christopher M. Klein, Chief Judge, U.S. Bankruptcy Court, Eastern District of California, sitting by designation.

KLEIN, Bankruptcy Judge:

This is a mandatory subordination case. The "damages" clause of 11 U.S.C. § 510(b) mandates subordination of claims for "damages arising from the purchase or sale" of a security of the debtor. The bankruptcy court concluded that § 510(b) mandatory subordination applies to the claim of appellant, who withdrew as a member of the debtor limited liability company ("LLC") and obtained a judgment valuing her equity interest after the LLC did not honor a provision in its operating agreement requiring buy-back of the withdrawing member's interest.

We agree with the bankruptcy court that permitting a former equity holder to recover the value of an equity-based claim on a par with general unsecured creditors is the sort of bootstrapping that § 510(b) mandatory subordination is designed to prevent. Rejecting appellant's argument that "damages arising from the purchase or sale" of a security does not encompass contract-based awards to withdrawing LLC members, we AFFIRM.

FACTS

The debtor, Tristar Esperanza Properties, LLC, is a California limited liability company whose sole asset is real property in Orange County, California. Tristar's organic governing document is in the form of an operating agreement.

Appellant Jane O'Donnell acquired a membership interest in Tristar (about 14 percent) in 2005 by means of a $100,000 capital contribution made through her investment retirement account with appellant Pensco Trust Company, which entity is content to be represented by O'Donnell and has not appeared in its own right.

2

In 2008, O'Donnell invoked the Tristar operating agreement's withdrawal provision by giving written notice of such intent.

Under the buy-back provision in the Tristar operating agreement, the notice of withdrawal triggered a process in which Tristar and the withdrawing member would use best efforts to agree upon the fair market value of the subject interest.

Tristar paid O'Donnell $60,000 on account and, jointly with O'Donnell, retained an appraiser who determined that the fair market value of O'Donnell's interest was $399,918 ($305/sq.ft.) as of the time of her withdrawal.  Tristar contends that this value is "absurd" because it was not adjusted to reflect $2.69 million in secured debt against its sole asset, which, if counted, would have reduced the recovery by about $377,000.

After Tristar declined to accept the valuation, O'Donnell initiated an arbitration that concluded in 2010 with a determination that Tristar was bound by the $399,918 value.

The arbitrator awarded O'Donnell damages of $399,918, less the $60,000 that Tristar had already paid.

The arbitration award was confirmed by a California superior court and reduced to judgment.  The abstract of judgment was recorded in Orange County in December 2010.

Tristar filed its chapter 11 case in the Central District of California in August 2011 and filed this adversary proceeding against O'Donnell and Pensco Trust, alleging three claims for relief:  (1) mandatory subordination under § 510(b); (2) equitable subordination under § 510(c); and (3) avoidance of a preference under 11 U.S.C. § 547(b).

The trial court disposed of all three claims for relief on

3

cross-motions for summary judgment. The net result was that Tristar prevailed on the mandatory subordination count, while the other two counts were resolved against Tristar.

With respect to mandatory subordination, the court reasoned that the scope of § 510(b) is broad and leaves little discretion where literal application is not demonstrably at odds with the intent of Congress. It explained that § 510(b) is designed to prevent equity holders from diluting the recovery of creditors who deal with the debtor only on a credit basis with no expectation of sharing in the value of the enterprise and with an expectation of having rights senior to equity interests.

In particular, the court rejected the argument that the confirmed arbitration award did not constitute a claim for "damages" within the meaning of the § 510(b) damages clause and emphasized that the arbitrator found that the debtor had breached its operating agreement. Under these circumstances, the court concluded that such an award qualified as § 510(b) "damages."

This timely appeal, limited to the § 510(b) issue, ensued.

JURISDICTION

Federal subject-matter jurisdiction exists under 28 U.S.C. § 1334(b). The bankruptcy judge had authority to hear and determine the matter under 28 U.S.C. §§ 157(b)(2)(A) and (O); no party has questioned that authority. We have jurisdiction under 28 U.S.C. § 158(a)(1).

ISSUES

1) Whether a contractually-required buy-back of an LLC membership interest from a withdrawing member constitutes a "purchase or sale" of a "security" of the debtor within the

4

meaning of 11 U.S.C. § 510(b).

2) Whether the appellants' claim is for "damages" within the meaning of 11 U.S.C. § 510(b).

3) Whether withdrawal as an LLC member prior to the bankruptcy filing renders 11 U.S.C. § 510(b) inapplicable.

4) Whether judicial estoppel should be imposed.

STANDARD OF REVIEW

We review summary judgment de novo. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1221-22 (9th Cir. 2010); Bendon v. Reynolds (In re Reynolds), 479 B.R. 67, 71 (9th Cir. BAP 2012). De novo review permits an appellate court to substitute its judgment for that of the trial court. Barclay v. Mackenzie (In re AFI Holding, Inc.), 525 F.3d 700, 702 (9th Cir. 2008). We must determine whether, viewing the summary judgment evidence in the light most favorable to the non-moving party, any genuine issue of material fact remains for trial and whether Tristar was entitled to a § 510(b) mandatory subordination judgment as a matter of law. Gill v. Stern (In re Stern), 345 F.3d 1036, 1040 (9th Cir. 2003).

DISCUSSION

This appeal requires construction of 11 U.S.C. § 510(b). After examining the applicable language of § 510(b), we tour the statute's legislative history and policy objectives. This inspection of the statute's underpinnings confirms that the arbitration award falls in the zone of transactions requiring mandatory subordination under § 510(b).

For us, this is a case of first impression in that we deal for the first time with the § 510(b) "damages" clause in the

5

context of an LLC and an arbitration stemming from the withdrawal provision of the LLC's operating agreement. The ultimate question is: whether a judgment debt, based on a confirmed arbitration award enforcing a buy-back provision in the debtor LLC's operating agreement, constitutes a claim "for damages arising from the purchase or sale of" a "security" of the debtor. 11 U.S.C. § 510(b). It does.

I

The Bankruptcy Code provides for three distinct forms of subordination: (1) subordination by agreement; (2) mandatory subordination of certain claims related to a security; and (3) equitable subordination. The first is a matter of contract; the second a matter of the nature of a transaction; and the third a matter of inequitable conduct. We focus here on the second.

Subordination demotes a claim from its nominal priority. A subordinated claimant receives a distribution junior in priority to the nominal class. 4 COLLIER ON BANKRUPTCY ¶ 510.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("COLLIER").

As our primary task is to interpret § 510(b) de novo, we begin with its language:

> (b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, <u>for damages arising from the purchase or sale of such a security</u>, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis supplied).

Thus, § 510(b) contemplates three types of claims –

6

rescission, damages, and reimbursement/contribution – that all have a nexus with the purchase or sale of a security. <u>Allen v. Geneva Steel Co. (In re Geneva Steel Co.)</u>, 281 F.3d 1173, 1177 (10th Cir. 2002); <u>see also</u> COLLIER ¶ 510.04. Only the damages clause is involved in this appeal.

A

At the threshold lies the question whether a membership interest in an LLC is a "security" as defined by Bankruptcy Code § 101(49). 11 U.S.C. § 101(49).

That statutory definition of "security" does not provide a functional description. Rather, it merely lists positive and negative examples. There is a fifteen-item list of examples of securities. 11 U.S.C. § 101(49)(A). And, there are seven examples of what is not a security. 11 U.S.C. § 101(49)(B). Neither list mentions a membership interest in an LLC.

But, the omission of mention of a LLC membership interest from the examples of "security" at § 101(49)(A) is not fatal to the status of such an interest as a "security" because the operative verb at the beginning of the list is "includes": "The term 'security' – (A) includes —... ." 11 U.S.C. § 101(49)(A).

Section 102 of the Bankruptcy Code provides a statutory rule of construction whereby the term "includes" is not restrictive. <u>See</u> 11 U.S.C. § 102(3) ("In this title — ... (3) 'includes' and 'including' are not limiting"). Therefore, the statutory list of what is a "security" at § 101(49)(A) is non-exclusive.

Since the fifteen-item list of what constitutes a "security" is non-exclusive, we look for an analogous entry on the list. In this regard, the statute is express that the "interest of a

7

limited partner in a limited partnership" is a "security." 11 U.S.C. § 101(49)(A)(xiii).

The similarities between the interest of a limited partner in a limited partnership and a membership interest in an LLC are substantial. For example, each owns an interest in the enterprise and shares in net revenues and increases in value, and those who extend credit to the enterprise do so in the expectation that their claims will be paid before any distribution to limited partners or LLC members.

It follows that, if the interest of a limited partner in a limited partnership is a "security" under the Bankruptcy Code, then the interest of a member in an LLC is also a "security" for purposes of the Bankruptcy Code.

Accordingly, an interest of a member in an LLC is a "security," the purchase or sale of which is vulnerable to § 510(b) mandatory subordination.

B

Appellants argue that the confirmed arbitration award is not "for damages" within the scope of § 510(b), but rather is a claim based on a judgment for "fixed debt." They further contend that, whatever the characterization of the claim may be, the right to payment did not arise from the purchase or sale of Tristar's securities. This necessitates a review of the meaning of § 510(b) in general and the damages clause in particular.

1

The starting point is the text of the statute. Lamie v. United States Tr., 540 U.S. 526, 534 (2004). Plain meaning should be conclusive, except when literal application will

8

produce a result demonstrably at odds with the intentions of its drafters. <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 242 (1989); <u>Snavely v. Miller (In re Miller)</u>, 397 F.3d 726, 730 (9th Cir. 2005). If the text of a statute is ambiguous, we resort to canons of construction, legislative history, and the statute's purpose to discern Congress's intent. <u>James v. City of Costa Mesa</u>, 700 F.3d 394, 399 n.8 (9th Cir. 2012).

2

The language of § 510(b) provides that "damages" requiring subordination must arise from the purchase or sale of the debtor's securities, but it does not otherwise purport to describe the nature of the claim for relief or the types of damages that may be recovered.

"Damages" is not a defined term in the Bankruptcy Code, but it has a well-understood general definition in the law. It generally means money "claimed by, or ordered to be paid to, a person as compensation for loss or injury." BLACK'S LAW DICTIONARY, 445 (9th ed. 2009) ("Damages").

The classic hornbook on damages likewise describes "damages" as "primarily how much can be recovered" on any basis for liability and as the preferred remedy over specific performance. Charles T. McCormick, HANDBOOK OF THE LAW OF DAMAGES § 1 (1935). Professor McCormick adds that an agreement to arbitrate all controversies arising from dealings under a contract empowers the arbitrator to determine all claims for damages, direct and consequential, from any breach of contract. <u>Id.</u> at § 4.

We perceive no ambiguity in the use of the term "damages" in § 510(b). Nothing has been presented to us to suggest that the

term has a narrower or specialized meaning in § 510(b).

In particular, we are not persuaded by the appellants' argument that § 510(b) "damages" connote some sort of actionable wrongdoing or malfeasance and not merely enforcing a contract term. The decision they cite for the proposition merely held that simple recovery of principal due under the promissory note in question did not constitute § 510(b) "damages" even though a "note" may be within the Bankruptcy Code definition of a "security." In re Blondheim Real Estate, Inc., 91 B.R. 639, 640 (Bankr. D.N.H. 1988). We do not read that decision to narrow the meaning of "damages" and, in any event, are not persuaded that § 510(b) "damages" require wrongdoing or malfeasance.

3

Having concluded that § 510(b) "damages" include all forms of "damages" known to the law so long as they arise from the purchase or sale of a security of the debtor, the question becomes whether, on our facts, there are § 510(b) "damages."

O'Donnell acquired her membership interest in Tristar in exchange for cash. This was the purchase of a security. She later invoked the buy-back process established by the Tristar operating agreement for withdrawal by members from the LLC. The subsequent disagreement over the purchase price determined by a jointly retained appraiser led to the arbitration proceedings.

After considering the details of the parties' course of conduct, including the applicable language of Tristar's operating agreement, the arbitrator determined that Tristar was obligated to repurchase the appellants' equity interest for the appraised price. The arbitrator found that Tristar had breached the

10

operating agreement and awarded the appellants "damages" commensurate with the appraisal. When Tristar still did not pay what was due, the appellants obtained a state-court judgment confirming the arbitration award.

Given that the arbitration award was an order to pay money to the appellants as a matter of contractual right, and achieved the status of a judgment debt once the award was confirmed, the arbitration award and judgment qualify as § 510(b) "damages."

The record also shows the arbitrator concluded that Tristar breached both "the letter and spirit" of the Tristar operating agreement, and, for that reason, was bound by the appraiser's determination. It is immaterial that appellants did not style the arbitration demand as being for breach of contract, fraud, or any other wrongful conduct. The purpose of the proceeding was to enforce a contract in circumstances in which Tristar's recalcitrance constituted breach of contract.

C

The next question is whether the appellants' claim arises from the "purchase or sale" of Tristar's securities.

1

Section 510(b) is limited to claims "arising from the purchase or sale of" a debtor's securities. What constitutes "arising from" has been considered and found ambiguous by the Second, Third, Fifth, Ninth, and Tenth Circuits.[1] No circuit has

---

[1] Ninth Circuit cases on the scope of § 510(b) mandatory subordination are: Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.), 493 F.3d 1067, 1073 (9th Cir. 2007) (rescission of a purchase or sale of a security of debtor); Am. Broad. Sys.,
(continued...)

11

taken a contrary view.

The factual scenarios in which investor claims have arisen from the purchase or sale of a debtor's securities are diverse. The LLC membership interest in this appeal is a new wrinkle.

The appellants characterize their claim as an ordinary debt obligation. They emphasize that O'Donnell withdrew as a member well before the bankruptcy proceedings, shed her equity status, and thereafter became a general creditor of the debtor. Although appellants argue that the claim is not one "stemming from alleged fraud or wrongdoing relating to the purchase or sale of a security," the weight of precedent has applied a broader construction of the "arising from" language.

The ambiguity in § 510(b) permits competing narrow and broad interpretations. A narrow reading would require that the injury flow from the actual purchase or sale. A broad reading would require that the purchase or sale be part of a causal link even though the injury may flow from a subsequent event. Fair arguments support each view. An influential case adopting the broad view is In re Granite Partners, L.P., 208 B.R. 332, 339

---

[1](...continued)
Inc. v. Nugent (In re Betacom of Phoenix, Inc.), 240 F.3d 823, 828 (9th Cir. 2001) (failure to deliver stock pursuant to merger agreement). Other circuits have addressed § 510(b): SeaQuest Diving, LP v. S&J Diving, Inc.(In re SeaQuest Diving, LP), 579 F.3d 411, 419 (5th Cir. 2009) (rescission arising from post-issuance conduct); Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 258-59 (2d Cir. 2006) (exchange of stock provision in termination agreement); Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133, 144 (3d Cir. 2002) (provision in stock purchase agreement to use best efforts to register stock); Geneva Steel, 281 F.3d at 1178 (10th Cir.) (fraudulent retention).

12

(Bankr. S.D.N.Y. 1997).

The Ninth Circuit favors the broad view and has expressed its approval of the Granite Partners analysis. Betacom, 240 F.3d at 828, citing with approval, Granite Partners, 208 B.R. at 333. It has concluded that § 510's legislative history does not reveal an intent to tie mandatory subordination exclusively to securities fraud claims. Id. at 829. Accordingly, we apply the broad view as the law of the circuit.

We now turn to the legislative history.

2

In drafting § 510(b), Congress relied on an influential article by John J. Slain and Homer Kripke: John J. Slain & Homer Kripke, The Interface Between Securities Regulation and Bankruptcy — Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U. L. REV. 261 (1973) ("Slain and Kripke"). The House Committee Report contains an extended discussion of Slain and Kripke in connection with § 510(b). H.R. Rep. No. 95-595, 1st Sess., at 194-96 (1977), reprinted in 1978 U.S.C.C.A.N. at 6154-56 ("House Report"), cited with approval, Betacom, 240 F.3d at 829.

Confronting the historical problem of investors recovering fraud claims pari passu with general creditors in bankruptcy cases, Slain and Kripke emphasized the dissimilar expectations of investors and creditors. They recognized that both creditors and investors "accept the risk of enterprise failure." Slain and Kripke at 286. The two constituent risks, however, are based on different assumptions. In the event of insolvency, the creditor expects higher priority vis-a-vis the investor, but, unlike the

13

investor, does not expect to participate in the profits of the enterprise.  House Report at 194-96; Betacom, 240 B.R. at 830-31.

The Ninth Circuit takes these dissimilar expectations into account in setting a standard for mandatory subordination because it is unfair to shift all of the risk to creditors who extend credit in reliance on the cushion of investment provided by the shareholders.  Betacom, 240 F.3d at 829-31.

Section 510(b) was spawned by uncertainty under prior law whether claims relating to securities transactions should enjoy an equal footing with the claims of general unsecured creditors: a "difficult policy question" in business bankruptcy concerns the relative status of a security holder who seeks to rescind a purchase of securities or to sue for damages based on such a purchase and wants to be treated as a general unsecured creditor. House Report, at 195.

Embracing the Slain and Kripke analysis, Congress explicitly resolved the dilemma in favor of subordination when it enacted § 510(b).  It was persuaded that it was appropriate to focus on the risk of insolvency as well as the risk of unlawful issuance of the debtor's securities.  Id. at 196.  The intent was to subordinate the distribution priority of rescission claims to all claims that are senior to the claim or interest on which the rescission claims are based.  Id.

Although Congress focused on rescission claims, it enacted more comprehensive language.  The Ninth Circuit has described how the scope of § 510(b) has gradually expanded to include claims based on contract law and other actions.  Am. Wagering, Inc., 493 F.3d at 1072.  Beyond the realm of rescission and investor fraud

14

claims, there is judicial consensus that the phrase "arising from" in § 510(b) should be construed broadly to encompass claims other than fraud claims, such as claims for breach of contract. Id. (collecting cases); Betacom, 240 F.3d at 828-29.

The broad interpretation of § 510(b) was cemented into the law of the Ninth Circuit in Betacom. There, shareholders of the debtor, who were to receive their shares through a merger agreement entered into between the debtor and another entity, brought a pre-petition action against the debtor for the debtor's failure to deliver the stock as required by the merger agreement. Betacom, 240 F.3d at 826. The court held the claim should be subordinated under § 510(b). Id. at 832.

Central to the Betacom court's analysis was a careful consideration of the rationales identified in the legislative history. The Ninth Circuit explained that there are two main rationales for mandatory subordination: "(1) the dissimilar risk and return expectations of shareholders and creditors; and (2) the reliance of creditors on the equity cushion provided by shareholder investment." Id. at 830. As to the reliance rationale, the court proposed, without deciding the issue, that creditors of a distressed enterprise be presumed to have relied upon each prior investment in equity and junior debt, subject to rebuttal to the extent that the investor can prove nonreliance. Id. at 831 n.3.

The Betacom precedent dictates that we reject the appellants' argument that, to be subordinated, their claim must sound in fraud or some sort of actionable wrongdoing. We cannot ignore the Ninth Circuit's reasoning in Betacom that nothing in

15

the Slain and Kripke analysis suggests that Congress's concern with creditor expectations and equitable risk allocation was limited to cases of debtor fraud. Id. at 829.

Likewise, in Am. Wagering, the Ninth Circuit looked favorably upon a linking test requiring a nexus or causal relationship between the claim and the purchase or sale of the securities. Am. Wagering, 493 F.3d at 1072. In its view, this test showed that courts were concerned with claims that tried to recharacterize what would otherwise be subordinated securities. Id. Bootstrapping to a higher status in the bankruptcy distribution scheme is blocked by § 510(b).

Applying the two rationales underlying § 510(b) to the facts presented here, we conclude that the appellants' claim is subject to mandatory subordination. O'Donnell was in fact an equity holder before she withdrew. During her tenure as a member of Tristar, she enjoyed the potential for profit based on the value of real estate. In fact, she enjoyed a considerable return: she contributed $100,000 initially and received an arbitration award for nearly $400,000. The confirmed arbitration award is directly linked to her ownership of a membership interest in the debtor; indeed, it is nothing other than her cashing out her equity (at a value that the debtor insists is highly inflated).

The second rationale for subordinating investor claims is the reliance of creditors on the so-called "equity cushion" created by an investor's contribution of capital. We presume that creditors relied on this equity cushion in deciding to extend credit to the debtor. By withdrawing as a member and liquidating her interest, O'Donnell altered the Tristar balance

16

sheet by extracting or, more appropriately, attempting to extract her initial contribution. This would effectively deflate the equity cushion to which trade creditors and the like would look in recovering their claims for fixed debt. The creditors of Tristar, by virtue of their status, were never to enjoy the returns of increased value.

The appellants have not attempted to rebut the presumption that creditors of Tristar relied on O'Donnell's contribution as a source of recovery. As such, the second rationale is also applicable. But even if appellants had argued that there was a lack of reliance, the presence of merely one of the dual rationales is sufficient. Waltzer v. Nisselson (In re MarketXT Holdings Corp.), 346 Fed. Appx. 744, 746 (2d Cir. 2009).

We hold that § 510(b) is sufficiently broad to encompass a claim that arose from the withdrawal of a member from an LLC, which withdrawal triggered a repurchasing process whereby the debtor-issuer was to buy back the interest from the investor.

II

The appellants, urging that the withdrawal from the LLC and the fixing of the claim before bankruptcy should prevent mandatory subordination, brand their claim as a "fixed debt." This is a familiar strategy for equity holders (current or former) in the bankruptcy arena. The appellants assert that O'Donnell traded the risks and rewards of an equity holder for the risks and rewards of a general creditor.

To be sure, the appellants are "creditors" who have "claims" against Tristar. A "creditor" includes anyone who holds a "claim" against the debtor that arose before the order for

17

relief.  11 U.S.C. § 101(10)(A).

The judgment confirming the arbitration award requiring the debtor to pay the fair market value of the former membership interest is a "claim."  See 11 U.S.C. § 101(5).

The purpose of subordination, however, is to adjust the place in line of certain claims in the bankruptcy distribution scheme.  Bankruptcy policy affords a priority to general creditors that is superior to equity interests.  As Professors Slain and Kripke explained in their seminal article, appropriate allocations of risk among general creditors and equity-type creditors should reflect the dissimilar risks regarding enterprise insolvency those creditors undertake.  Granite Partners, 208 B.R. at 336.

Whatever might be said of a transformation of equity into debt in a transaction that is old and cold and that has long been treated as part of the enterprise's debt structure, this is not such a case.  Rather, the buy-back transaction was a disputed issue until shortly before the chapter 11 case was filed and was, doubtless, a material factor in the need for chapter 11 relief. The dispute over the buy-back amount and the chapter 11 filing were sufficiently proximate in time to warrant the conclusion that this is an effort by equity to capture paper (and arguably mythical) profits via a judgment for money damages.

Treating an equity investor on a par with unsecured creditors disregards the principles underlying the absolute priority rule in a manner that undermines this basic bankruptcy concept.  Granite Partners, 208 B.R. at 344; 11 U.S.C. § 1129(b)(2)(B)(ii).

The appellants' argument that they extricated themselves from the equity position before the bankruptcy filing does not necessarily militate against the application of mandatory subordination. The Bankruptcy Code definition of "security" extends far beyond holders of stock. 11 U.S.C. § 101(49)(A). The text of § 510(b) does not require that a subordinated claimant be a shareholder. <u>Betacom</u>, 240 F.3d at 829. What matters is the type of claim, not the type of claimant. <u>Id.</u>

In short, the claim is so firmly rooted in O'Donnell's equity status that subordination is mandatory.

III

Finally, we reject the arguments that the appellee is barred by principles of judicial estoppel from asserting that the claim is for § 510(b) "damages" and that Tristar filed for bankruptcy as a bad faith collateral attack on the arbitration award.

A

The appellants posit that Tristar's statement in the arbitration that it "still owes O'Donnell money to complete the liquidation of her membership interest" should now estop Tristar from asserting that the claim is for § 510(b) "damages."

This is an assertion of the form of the equitable doctrine of judicial estoppel known as the estoppel of inconsistent positions, which prevents one from gaining advantage by taking one position and later seeking to reap another advantage from an inconsistent position. <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749-51 (2001); <u>United States v. Ibrahim</u>, 522 F.3d 1003, 1009 (9th Cir. 2008); <u>Hamilton v. State Farm Fire & Cas. Co.</u>, 270 F.3d 778, 782-85 (9th Cir. 2001); <u>Alary Corp. v. Sims (In re Associated</u>

19

*Vintage Grp., Inc.)*, 283 B.R. 549, 565-67 (9th Cir. BAP 2002).

While there are not inflexible prerequisites for judicial estoppel, the Supreme Court has emphasized the importance of a "clearly inconsistent" position, coupled with acceptance of the first position in circumstances that would create the perception that one of the tribunals was misled, plus some form of unfair advantage or detriment. *New Hampshire v. Maine*, 532 U.S. at 750-51; *Alary Corp.*, 283 B.R. at 566.

The appellants claim that Tristar is "playing fast and loose with the courts" by admitting a debt obligation in one instance, and later arguing that the obligation is one for "damages." There are two flaws in this argument.

The first flaw is that there is no material inconsistency between the concession that something remains to be paid to complete the liquidation of the membership interest and the assertion that whatever sum is owed to liquidate that interest constitutes § 510(b) "damages." This amounts to missing the forest for the trees; here, "damages" refers to a forest, not a single tree.

Second, and independently fatal, is the absence of any advantage that was gained by Tristar in the earlier arbitration on account of the putatively inconsistent statement. *New Hampshire v. Maine*, 532 U.S. at 750-51.

We perceive no material inconsistency between an admission that a debt is owed and claiming that the debt owed is one for § 510(b) "damages." Nothing suggests that the appellee gained any advantage by the first statement. Nor do we perceive an unfair advantage or unfair detriment. Hence, we reject the

20

appellants' argument based on judicial estoppel.

B

We also reject the appellants' claim -- first raised in the reply brief -- that the appellee filed its chapter 11 case with the sole intent of avoiding paying the remainder of the value of O'Donnell's membership interest. Debtors have numerous motives for filing a bankruptcy case. The goal of the federal bankruptcy laws is the adjustment of the debtor-creditor relationship. The resulting adjustment -- in this case subordination -- may not be welcomed by the appellants. But it is certainly permitted.

Nor is chapter 11 an impermissible collateral attack on the validity of a state court judgment. The amount that is owed is not questioned. The issue is priority and terms of payment.

Hence, there is no genuine issue of material fact that there was an arbitration award, confirmed by judgment, for that amount.

CONCLUSION

The bankruptcy court correctly granted summary judgment in favor of the appellee on its § 510(b) claim. There is no genuine issue of material fact and the appellee is entitled to judgment as a matter of law. The appellants' right to payment, based on a confirmed arbitration award valuing the membership interest in the LLC, constitutes a claim for damages arising from the sale of the appellee's securities that is subject to mandatory subordination by virtue of § 510(b). We AFFIRM.